## STATE EX REL. MILLER, ATTORNEY GENERAL v. TAYLOR et al.

### (133 N. W. 1046.)

Construction of Constitution — resorts to debates of convention.

    1. When the meaning of words or terms employed in the Constitution is uncertain or ambiguous, resort may be had to the debates of the convention

Note.—As to the right to consult debates of the constitutional convention in determining the meaning of words or terms employed in the Constitution, see Rasmussen v. Baker, 7 Wyo. 117, 38 L.R.A. 773, 50 Pac. 819, holding that, while de-

which framed and submitted the Constitution, as an aid in determining their meaning; and for the same purpose the interpretation placed upon such provisions by several sessions of the legislative assembly and by the people in voting thereon is entitled to great weight; and the intent, if it can be gathered from such proceedings, without doing violence to the words employed, is controlling.

**Amendment of Constitution — method — construing "revise" as "amend."**
2. Article 15 of the state Constitution provides the only method named in the Constitution for making changes therein, to wit, that any amendment or amendments thereto may be proposed in either house of the legislative assembly, and if agreed to by a majority of each of the two houses, it or they may be referred to the next legislative assembly when, if agreed to in the same manner, it or they shall be submitted to the people for ratification or rejection.

Article 19 of the Constitution locates the public institutions of the state, and, among others, two state normal schools. Appended to such article is a proviso to the effect that no other institution of a character similar to any one of those located therein shall be established or maintained, without a revision of such Constitution. *Held*, that the meaning and purpose of such proviso is to prohibit the legislative assembly from locating any similar additional institutions, and that, in the light of the debates of the constitutional convention, the action of several legislative assemblies, and the votes of the electors

---

bates of the constitutional convention may for some purposes, but in a limited degree, be consulted in determining a doubtful phrase or provision of the Constitution, they are, as a general rule, deemed an unsafe guide. For cases as to the effect of legislative interpretation of the Constitution long established and acquiesced in, see State v. Gerhardt, 145 Ind. 439, 33 L.R.A. 313, 44 N. E. 469; People ex rel. Mooney v. Hutchinson, 172 Ill. 486, 40 L.R.A. 770, 50 N. E. 599; State v. Narragansett, 16 R. I. 424, 3 L.R.A. 295, 16 Atl. 901; Indianapolis v. Navin, 151 Ind. 156, 41 L.R.A. 337, 47 N. E. 525, 51 N. E. 80; Re Bank of Commerce, 153 Ind. 460, 47 L.R.A. 489, 53 N. E. 950, 55 N. E. 224.

That the rule of construction by long and continuous usage should be applied to a constitutional provision only in cases of doubt is declared in Pingree v. Auditor General (Pingree v. Dix) 120 Mich. 95, 44 L.R.A. 679, 78 N. W. 1025. And that long usage and practical interpretation cannot control in the interpretation of the Constitution unless the language is obscure and doubtful is decided in State ex rel. Morris v. Wrightson, 56 N. J. L. 126, 22 L.R.A. 548, 28 Atl. 56. But that the contemporaneous interpretation of a Constitution by those who had opportunity to understand the intention of the instrument is a strong presumption in its favor is held in State ex rel. Guerguin v. McAlister, 88 Tex. 284, 28 L.R.A. 523, 31 S. W. 187. And that a practical construction of the state Constitution for nearly forty years will be conclusive of its meaning when that would otherwise be doubtful is declared in French v. State, 141 Ind. 618, 29 L.R.A. 113, 41 N. E. 2.

of the state, as well as the spirit of the Constitution, and the fact that the words "revise" and "amend" are popularly, and often, in a legal sense, employed synonymously, said article 19 may be amended so as to provide for the location of additional similar institutions by the method provided in article 15 for submitting and adopting amendments to the Constitution.

### Appropriation for normal school building — conditions.

3. The appropriation made by chapter 22, Laws of 1911, p. 25, for the erection of normal school buildings, and providing for furnishing and maintenance thereof, at Minot, is not rendered invalid by a proviso therein contained to the effect that none of the sums appropriated shall become available unless the citizens of Minot shall donate to the state a suitable location and site for such school.

Opinion filed December 11, 1911.

Original application by the State, on the relation of Andrew Miller, Attorney General, for an injunction permanently restraining E. J. Taylor and others, as the State Board of Normal School Trustees, from establishing a state normal school in the City of Minot, and Gunder Olson, as Treasurer, from paying out the money of the State therefor.

Denied, and temporary order quashed.

*Andrew Miller,* Attorney General, and *Alfred Zuger* and *C. L. Young,* Assistant Attorneys General, for the State.

*John E. Greene, Francis J. Murphy, Robert H. Bosard, H. L. Halvorson, Dorr H. Carroll,* and *V. B. Noble,* for defendants.

SPALDING, Ch. J.   This is an application for a permanent injunction restraining the defendants, who are the State Board of Normal School Trustees, and the state treasurer, from locating a proposed normal school at the city of Minot, in Ward county, and expending any money belonging to the state of North Dakota for such purpose or for the erection of buildings therefor.   The questions involved are of great temporary interest and importance; but, as the main question is unlikely ever to arise a second time, we shall content ourselves with stating the reasons for our conclusions as briefly as possible.

Article 19 of the Constitution prepared by the constitutional convention in 1889, and in October of that year approved by the voters of that part of the territory now comprised in the state of North Dakota, locates the public institutions of the state.   It is composed of §§ 215

and 216. Section 215 provides that the following public institutions of the state are permanently located at the places thereinafter named, each to have the land specifically granted to it by the United States in the enabling act, to be disposed of and used in such manner as the legislative assembly may prescribe, subject to the limitations provided in the article on school and public lands, contained in the Constitution: The seat of government, the state university, the school of mines, the agricultural college, a normal school at Valley City and one at Mayville, a deaf and dumb asylum, a reform school, and a state hospital for the insane and institution for the feeble minded in connection therewith. And provision is made for the apportionment of public lands among some of them.

Section 216 provides that the following named public institutions are permanently located, each to have so much of the remaining grant of 170,000 acres of land made by the United States for other educational and charitable institutions as allotted by law, namely: A soldiers' home, or such other charitable institution as the legislative assembly may determine, at Lisbon; a blind asylum, or such other institution as the legislative assembly may determine, to be determined by an election, in Pembina county; an industrial and manual training school, or such other educational or charitable institution as the legislative assembly may provide; a school of forestry, or such other institution as the legislative assembly may determine, at a place to be selected by the electors of four specified counties.

The locations of the foregoing institutions are named, and a portion of the land granted apportioned among them. The fifth subdivision of § 216 reads: "A scientific school, or such other educational or charitable institution as the legislative assembly may prescribe, at the city of Wahpeton, county of Richland, with a grant of 40,000 acres; provided, that no other institution of a character similar to any one of those located by this article shall be established or maintained without a revision of this Constitution."

Article 15, comprising § 202 of the Constitution, reads as follows: "Any amendment or amendments to this Constitution may be proposed in either house of the legislative assembly; and if the same shall be agreed to by a majority of the members elected to each of the two houses, such proposed amendment shall be entered on the journal of the house,

with the ayes and nays taken thereon, and referred to the legislative
assembly to be chosen at the next general election, and shall be pub-
lished, as provided by law, for three months previous to the time of
making such choice and if in the legislative assembly so next chosen
as aforesaid such proposed amendment or amendments shall be agreed
to by a majority of all the members elected to each house, then it shall
be the duty of the legislative assembly to submit such proposed amend-
ment or amendments to the people in such manner and at such time as.
the legislative assembly shall provide; and if the people shall approve
and ratify such amendment or amendments by a majority of the
electors qualified to vote for members of the legislative assembly voting,
thereon, such amendment or amendments shall become a part of the
Constitution of this state. If two or more amendments shall be sub-
mitted at the same time, they shall be submitted in such manner that.
the electors shall vote for or against each of such amendments separ-
ately."

The tenth legislative assembly adopted a concurrent resolution for
an amendment to the Constitution by adding to the institutions named
in § 216 a state normal school at the city of Minot, in the county of
Ward. This resolution was certified to the eleventh legislative as-
sembly, adopted by it, and submitted at the general election held in
November, 1910, when it met with approval. By these proceedings.
the amendment took the form of a submission of all formerly contained
in § 216, with the addition of a sixth paragraph providing for the
Minot normal school.

The main contention of the state on this application is that by the
terms of the proviso found in the 5th subdivision of § 216, supra, the
legislative assembly had no power to submit to the electors an amend-
ment increasing the number of normal schools. The substance of its.
claim is that at the time of the adoption of our Constitution the word
"revise" or *"revision,"* used in reference to changes in Constitutions,.
had a definite or technical legal meaning, and that the word "amend"
or "amendment," in such connection, had a quite different meaning;
that the word "revise" or "revision," in such connection, was associated
only with the calling and holding of a constitutional convention, with
power to make or submit complete or partial changes in the constitu-
tion as it might deem expedient; that the method provided by our Con-

stitution for making amendments through the means of submission by the legislative assembly to the electors was known as the *legislative method,* and was well understood in law to refer only to specific or definite changes or additions to the Constitution as it existed; and that the word did not relate or refer to any other than the legislative method, and certainly not to changes made by means of a convention. In other words, that "to revise" means to submit the subject to the people through a constitutional convention, and to "amend" relates only to a submission through the legislative assembly. It is urged on the part of the state that, by the use of the words, "without a revision of this Constitution," the constitutional convention, and the people adopting the Constitution, have said that the powers of the legislative assembly as defined by article 15, supra, are limited, and that article 19 cannot be changed by amendment so as to increase the number of similar institutions, and that the hands of the legislative assembly are tied regarding the submission of amendments.

On the other hand, respondents' contention is that *revision* and *amendment* are synonymous terms, in connection with the changes in a Constitution; and that the proviso in § 216 means precisely the same as though it read, "without amendment of this article," and that the courts are not concerned with the technical or strict legal meaning of the word "revision."

Having thus stated the main question and the claims of the respective parties concerning it, we proceed to consider some of the reasons which impel us to the conclusion which we reach. And in doing so we may concede that in a general way the word "revision" and the word "amendment," in connection with changes in Constitutions, are treated by some authorities as applying to two distinct methods of making changes such as those to which reference has been made.

The question before us is what meaning attaches to the word "revision," as employed in § 216. In the states of the American Union, sovereignty inheres in the people. Constitution North Dakota, § 2. Constitutions are adopted to insure a stable system of government, including a division into departments, fixing the number and character of offices in each, and in general providing a scheme or system of government. In addition to this, such Constitutions are a means employed by the sovereign people to limit the powers of their agents, especially

those of the legislative department. When a method of submitting amendments to the Constitution, originating in the legislative assembly, is provided, that body, in framing and submitting them to the electors for ratification or rejection, does not act in its legislative capacity, but as the agent of the sovereign people appointed by and through the terms of the organic law. Livermore v. Waite, 102 Cal. 118, 25 L.R.A. 312, 36 Pac. 424.

In determining whether this agency of the sovereign people was authorized by its principal to submit the amendment in question, we first consider what the nature of the change attempted in article 19 was. Was its character such as to make it essentially an amendment which could properly, in the absence of limitations, be submitted through the legislative method, or was the nature of the subject, its relation to other parts of the Constitution, or the extent of the change made, such that it could more properly be made through the medium of a constitutional convention? If essentially an amendment in its nature, rather than of such a character as to call for a reconsideration of the whole Constitution, we may much more readily conclude that no strained construction should be employed and no technical meaning given words to support the contention of the state in this proceeding and thereby defeat the will of the people as expressed by means of the ballot.

An examination of the Constitution and of this change in article 19 can lead to but one conclusion, and that is that in its essential elements the addition of one normal school to the public institutions enumerated is, as the word "amendment" is understood popularly, and even generally understood in a legal sense, an amendment; that it calls for and necessitates no general review of the Constitution. It is unrelated to any other subject or article in the Constitution. No other paragraph is affected by the change, and its relation to the whole Constitution, and to each of its parts, is such that we cannot assume that a review of a single remaining paragraph of the Constitution would be considered by anyone as necessary in connection with the increase of the number of public institutions to the extent attempted.

The change made is essentially in the nature of an amendment, rather than of a revision, using the word "revision" in the sense in which it is employed by counsel for the state and as several authorities

seem to hold it as generally employed in this relation. This may also be said of any similar change regarding the institutions.

The next question is: What was the intent of the constitutional convention in employing the language contained in the proviso in question? The intent of the convention is not controlling in itself; but, as its proceedings were preliminary to the adoption by the people of the Constitution, the understanding of the convention as to what was meant by the terms of this provision goes a long way toward explaining the understanding of the people when they ratified it. The people depended largely upon the interpretation and construction placed upon the various constitutional provisions by the delegates who framed them. An examination of the journal and debates of the constitutional convention sheds some light upon the understanding of the delegates. It is true that no reference is made in such debates to the proviso under consideration, but by one familiar with the history of that convention the absence of any such reference is readily accounted for. The article which locates the public institutions was the subject of the most general interest of any contained in the Constitution. The reported debates are very meager as to the meaning of any words or phrases employed, but the reason for this is readily explainable. The convention and the people were divided into two factions. Those advocating the adoption of article 19 were in the majority. The article was formulated and discussed outside the convention, in caucuses and committees, at which the line of action of each faction was determined upon. The contest raged around the fact of the location of the institutions through the medium of the Constitution, and the number to be so located. Many contended that they should be the subject of legislation, and others that the number created was excessive. The details of the provisions were not discussed in the convention, and the effect of the majority was directed toward securing the adoption of the provisions, and also, at the same time, to prevent the legislature from adding to the number of state institutions without a change being made in the Constitution to provide for an increase. The details and interpretations have been considered in caucuses and committees, and no record preserved.

When we come to article 15, relating to the method of amending the Constitution, we find a more general discussion. It will be observed that the subject of article 15 is that "any amendment or amendments

22 N. D.—24.

to this Constitution," etc. A review of the debates shows that one faction of the convention—in the main the faction which located the institutions—advocated methods by which changes in organic law would be rendered somewhat difficult; and amendments to article 15, as adopted, were offered, providing, in addition to the legislative methods, one of calling constitutional conventions; but the proposed amendments were all rejected. Remarks of different members of the convention disclose that the words "revise" and "amend" were used indiscriminately and interchangeably, and clearly indicate that in the minds of the participants in such debates, as well as others, no distinction was drawn in the application of those words to the two methods of changing the Constitution.

It is also reasonably clear that the body of the delegates failed to understand, what seems to be the consensus of authorities at the present time, that the legislative assembly has the inherent power to submit the question of calling a constitutional convention to the electors; that the delegates and the convention acted on the supposition that article 15 provided the only method by which the Constitution could be changed; and that its terms were broad enough to permit of submitting sufficient amendments to change much or little of the Constitution, through the legislative method. Whether they were correct in their suppositions or conclusions is immaterial; but the fact that they entertained opinions, which, as we have said, it is reasonably clear they did entertain, sheds great light upon their intent in the use of the word "revision" and their understanding of its meaning and application.

It would be too violent an assumption to assume that it was intended to disregard the history of new states in the West, the possibility and the probability of their steady and enormous increase in population, and the consequent necessity for an increase in their school facilities. The debates themselves indicate that they anticipated a rapid increase in the population of the new state. These facts being apparent, is this court justified in assuming that the delegates, or a majority of them, intended to preclude the legislative assembly from submitting any amendments, increasing the number of educational institutions, to the electors for ratification, and are we justified in assuming that they used the word "revision" advisedly in its technical or, as contended, in its legal sense, as applicable to changes in Consti-

tutions, and thereby excepted article 19 from the general provisions of article 15 regarding amendments, and intended to foreclose the legislative assembly and the people from making such an increase in public institutions? We think to assume that it was intended to eternally prohibit the people from this would be unwarranted.

The records of the convention show, and by some knowledge of contemporaneous history we know, that one of the chief concerns of the people and of the constitutional convention was to provide adequate school facilities, not only for the children of that day, but for those of future generations. It being reasonably apparent that the interpretation of the provision in question contended for by the legal department of the state is not borne out by the attitude and understanding of the delegates in the convention, the next inquiry is: How shall we reasonably assume the people, in ratifying the Constitution, understood it?

As we have observed, their understanding must have been largely derived from the understanding of the provisions of the Constitution had by the delegates who framed it; but, in addition to this, we may suggest that if the 6th Amendment, changing subdivision 8 of § 215, and separating the institution for the feeble-minded from the state hospital for the insane, adopted some years since, is construed as the location of a new and additional institution, their vote in ratifying such change furnishes practical evidence of their understanding that the word "revision" was synonymous with "amendment." However, we do not decide whether that was an addition or a separation. The amendment providing for the normal school at Minot was adopted by a vote of 45,792, for, as against 25,743, opposed, and it is clearly evident that in casting this vote the electors understood the meaning of the proviso the same as it had been understood by the members of the convention. These considerations are not controlling, but tend to show the understanding of the people on the subject, and are proper subjects of consideration when courts are attempting to arrive at the meaning of ambiguous language in a statute or Constitution.

Again, assuming that the legislative assembly has the power to submit the question of calling a constitutional convention without express provision contained in the Constitution for doing so, would a constitutional convention be the most appropriate instrument by which

to make an addition of one institution to those originally contained in article 19, or could it be more readily, intelligently, economically, and appropriately provided for by means of a simple amendment? In discussing the expediency and appropriateness of employing the two methods of making changes, Jameson, in his work on Constitutional Conventions, indicates the character of changes which are most appropriate to each of the two methods. His reasoning on the subject is commonplace, and its correctness must be apparent to a person of the most ordinary intelligence. It is, in effect, that where only a few, and those simple, changes are desired, the legislative method is most expedient and appropriate, but that where the relation of one part to another is important, and a general review of the whole Constitution is desired, the convention system is most expedient and furnishes means for the most intelligent and effective consideration. But, as we have said, we see no call, on any of these considerations, for a convention to make the change attempted. This is quite persuasive evidence that it was not intended to require the action of a convention to make such increase.

We think it is evident that the language employed in this proviso is ambiguous and its meaning not free from doubt. If any doubt can exist of the ambiguity of this language or of the meaning of the word "revision," some light may be shed upon it by considering one or two imaginary conditions. Leaving out the Declaration of Rights and the schedule, our Constitution contains about 190 sections. Let us suppose the legislative assembly should submit, at each session, amendments to 19 sections, charging each section in such a manner that it in no way resembled the original section; that all such changes were ratified by the people; and that this should continue for ten sessions. We would have a new Constitution *in toto,* bearing no resemblance to the original Constitution. On the theory adopted by the state, we should then have only an amended Constitution. We should have had no revision of the Constitution. Now, let us take another step. Suppose in this process all articles had been amended except article 19, and at the eleventh session of the legislative assembly there should be considered proposed changes in article 19, increasing the number of institutions. It would become apparent that on the theory of the state, notwithstanding the fact that the whole Constitution, aside from that

article, had been changed, the legislative assembly would have no power to submit the proposed changes, and that the number of institutions could not be increased except through the means of a constitutional convention; and to effect such an increase a convention must be called for that purpose alone. On the other hand, suppose a convention were to be called in the immediate future, the delegates should be elected, the convention convened, and after due deliberation it should be adjourned, having submitted no changes in the Constitution except one to increase the number of state institutions. If the contention of the state were to be maintained, a revision of the Constitution would have taken place. Undoubtedly in a legal sense this would be true, because the convention would have reviewed the whole document; but in a popular sense and in any way except by the most technical interpretation, the result of the first illustration would be deemed a revision of the Constitution and that brought about through the last only an amendment. And we think this is clear.

The mere fact that two legislative assemblies have interpreted its meaning, and the intent of the people in adopting it, one way, and the legal department of the state another, is also some evidence of such ambiguity or uncertainty, and to this we may add that the members of this court have only, after diligent effort, been able to reach a decision. We do not regard the question as beyond doubt even now; the fact that it is not so, among other things, impels us to our present determination.

We have proceeded, in our discussion of the question presented, upon the theory that the intention should be followed if it can be discovered, and that the spirit of the Constitution has an important bearing upon its construction, and that if the contention of the state, as to the generally accepted legal meaning of the word "revision," is correct, its meaning, as employed in the proviso in question, is disclosed by the spirit of article 19 and article 15, rather than by following the obscure and generally unknown technical meaning given it by the legal department. People ex rel. Atty. Gen. v. Utica Ins. Co. 15 Johns. 358, 8 Am. Dec. 243; Ryegate v. Wardsboro, 30 Vt. 746; Atkins v. Fibre Disintegrating Co. 18 Wall. 302, 21 L. ed. 844.

In other words, we are satisfied that the convention and voters all believed it was used in its popular sense, and meant precisely the same

as though "amendment" had been used. We find nothing in the authorities so clearly defining and distinguishing between the meanings of the words "revision" and "amendment," in this connection, so as to overcome the reasons mentioned and the undoubted fact that in popular use they are often employed interchangeably.

There is still another principle bearing directly upon this question. It may be thus stated: When the legislative assembly repeatedly construes or interprets a constitutional provision, such construction or interpretion should be followed by the courts, when it can be followed without doing violence to the fair meaning of the words used, in order to support the legislative action and give effect thereto, if the language construed admits of such construction. Ogden v. Saunders, 12 Wheat. 213, 270, 6 L. ed. 606, 625; Grenada County v. Brogden (Grenada County v. Brown) 112 U. S. 268, 28 L. ed. 708, 5 Sup. Ct. Rep. 125; Sykes v. Columbus, 55 Miss. 115; Cooley, Const. Lim. 218; Adams v. Howe, 14 Mass. 340, 7 Am. Dec. 216; State ex rel. Wells v. Tingey, 24 Utah, 225, 67 Pac. 33.

Leaving out of consideration the action of the legislature and the people in reference to the institution for the feeble-minded, two sessions of the legislative assembly of this state have construed the proviso to § 216. They did this by adopting the resolution submitting the amendment making an increase to the number of normal schools to the vote of the people. And unless all reasonable doubt as to the meaning of such proviso is removed from the minds of the court, leaving it clear that no increase can be made except through the medium of a constitutional convention, it is the duty of this court to sustain the action of the legislature and uphold the result of the election.

It cannot be said that a right has been established by legislative construction or interpretation; certainly not unless of very long continuance. Yet it is entitled to great weight, unless it can be said to be a clear usurpation of power or an arrogation of the text. Cooley, Const. Lim. 81–86. And it is said in 8 Cyc. 436, that this rule should be adhered to where the doubt turned upon the meaning of a single word, and it appears that the legislative interpretation is consistent with the common usage and understanding, as opposed to a strictly technical definition.

Again, article 15 contains the general provisions for amending the

Constitution.  No sections of the Constitution are made exceptions to this application; and we see no reason why, in conformity with the terms of this article, the legislative assembly may not submit amendments to article 19.  It certainly can do so as to all its provisions except the increase of institutions, and if this be true, it could submit an amendment to the proviso changing the word "revision" to "amendment," or eliminating it entirely.  Should it be amended and the proviso eliminated, what would then prevent the legislature from itself increasing the number of similar institutions?  If their number could be increased by the legislature, after such amendment, why cannot they be increased by the more direct method of amending the Constitution?  In other words, it appears reasonably clear to us that to remove the question from all doubt it would be necessary to add directly to article 15 an exception, limiting its application, and that, in the absence of such an exception, we must hold that article 19 may in any respect be amended in the usual way.

The legal department of the state has presented its side of this question with great earnestness and ability.  It was highly important that the expenditures called for by the location, establishment, and maintenance of this institution should not be made without the legal right to make them being first established by appropriate proceedings and the judgment of this court, and in instituting the proceeding the attorney general was but performing a duty imposed upon his office by law.

Our conclusion is that the proviso was intended to prevent the legislative assembly from increasing the number of institutions, and that its meaning is the same as though it had read that no other institution of a character similar to any one of those located by this article shall be established by the legislative assembly.  See Mr. Freeman's valuable note, 86 Am. St. Rep. 276, ¶ 12.

One other question remains for decision.  The last legislative assembly, by chapter 22 of its acts, made an appropriation of $200,000 for the erection of buildings, heating plant, construction of sewer, and for maintenance for two years.  Attached to the provision making the appropriation was a proviso to the effect that, before any of the sum appropriated should become available, the citizens of Minot should donate a suitable location of not less than 60 acres, free from all en-

cumbrances, and deed the same to the state; the selection of said site to be determined by the normal school board.

The state contends that this is not a valid appropriation because not effective except upon the action of the citizens of Minot. It appears to us that this point is not well taken. The legislature, in effect, said: "It will require $200,000 to put this school into operation during the next two years, and in addition to that, sufficient to procure a suitable site. The school is located by the Constitution at Minot, but it is discretionary with the legislative assembly when to provide an appropriation and to determine the amount necessary to set the school in operation. We have not sufficient money available for the purpose at this time. If the citizens .of Minot are enough interested in the subject to furnish .the site, and thereby relieve the state from that burden, we will make an appropriation of so much money as is available; the amount named to be subject to use if and when the site is furnished."

We see no reason why this is not a valid exercise of legislative power, under circumstances like these. The weight of authority seems to sustain its validity, and we know that this method has been in use by numerous legislatures for many years. We think that Walton v. Greenwood, 60 Me. 356, and Edwards v. Lesueur, 132 Mo. 410, 31 L.R.A. 815, 33 S. W. 1130, are directly in point. In the first-cited case the Maine court passed upon the validity of an act which removed the county seat from Norridgewock to Skowhegan, and authorized the county commissioners to locate .a courthouse in the latter place, and held that such act was not invalidated or rendered unconstitutional by the terms which made it void and of no effect unless the town of Skowhegan, or its citizens, should on or before a day named, without expense to the county, provide a suitable room and other accommodations for the court and officers, to the acceptance of a majority of the county commissioners, and execute and deliver a lease to secure the use thereof for five years, and also convey a suitable site for county buildings in Skowhegan.

And a similar provision in a proposed constitutional amendment was passed upon in the last-cited case and sustained.

The people of Minot are not parties to this action,—at least not of record,—and are not complaining of the condition attached to the appropriation. The state is certainly not injured by the donation of a

site for a school which has been located by the Constitution, and is not in position to object to the condition.

The temporary writ is quashed, and the application for permanent injunction is denied.