Two cases, tried and, here, submitted together. The former, Wittmayer v. Bank Elevator Co. is at law to recover damages for the conversion of grains; verdict for plaintiffs, judgment entered upon it, motion for new trial made and denied and appeal taken from the order and judgment. The latter case, Bank *Page 848 
v. Wittmayer, is in equity to enjoin the defendant, his agents and servants, from interfering with the plaintiff's possession of certain lands on which the grains involved in the other action were grown. Submitted to the trial court on the record made in the law action, relief denied plaintiff and action dismissed, from which decision appeal is taken to this court. As held by the trial court, the determination of the law action determines the one in equity; if in favor of the plaintiffs, relief might be given.
The essential facts are concisely as follows: The east half of section 36, township 160, range 78 in Bottineau county was originally public school land. In 1905 John Wittmayer purchased it from the state and received the usual certificates for such purpose. He made the first payment on the principal as required by law, and paid the interest and taxes until 1912, when he ceased to pay either. He is the father of Otto and Marvin Wittmayer. No one ever lived on this land, the Wittmayer home being at some distance from it and in another county. John Wittmayer, as purchaser, placed the land in cultivation and cropped it, up to and including the year 1924.
On January 10th, 1923, the board of university and school lands adopted a resolution declaring John Wittmayer's contracts for the purchase of the land void, and directing notice thereof to be given to Wittmayer, who admits that he had notice thereof.
One Hanson, an officer of a bank to which Wittmayer was indebted after negotiations with John Wittmayer, procured a lease of the lands for the year 1923 from the land commissioner, with the knowledge and for the immediate benefit of Wittmayer, but with the expectation that his bank might in some way thereby benefit to the extent of collection of at least a part of Wittmayer's debt. Wittmayer farmed the land in 1923, raised little crop upon it and, in the fall, when Hanson tried to collect the rent his bank had paid the state for the land for that year, Wittmayer recognized the validity of the claim, but said that he could not pay it then as he had no crop. After some discussion Hanson suggested that his bank would pay the rent for 1924 and he would obtain another lease for that year, to which Wittmayer assented. Hanson had some correspondence with the land commissioner about leasing the land for 1924, but no lease was made. In the fall of 1923, before the Hanson lease expired on January 1st, 1924, John *Page 849 
Wittmayer seeded part of this land to rye. In the spring of 1924, either John, or his two boys, seeded the rest of the cultivated land to wheat and oats. The crops involved in the law action are this rye, wheat and oats.
Wittmayer was indebted to the defendant, the Security State Bank of Upham, in a considerable amount. He mortgaged the land in question to secure this indebtedness. In July, 1924, one Grimes, cashier of the defendant bank, went to Bismarck, interviewed the land commissioner, learned that the records of the board showed that the purchase contract of Wittmayer for this land had been cancelled, that the land was to be rented and the minimum sum for which it could be rented. He returned home, went to the county treasurer, made a formal application to rent the land for 1924 up to January 1st, 1925, paid the treasurer the amount of the rent, which application and payment were sent to the land commissioner and, on August 1st, 1924, leases in the form used by the board were executed by the land commissioner and returned either to the treasurer or to the bank, the record being silent on that point. But, on August 4th, 1924, the leases were in the possession of the bank.
On that day, August 4th, Grimes, cashier of the Upham bank, went to interview John Wittmayer about the matter, told Wittmayer that the bank had leases for the school land and did not want Wittmayer to interfere with the crops on it. Wittmayer told Grimes that he had no interest in the crops, that they belonged to the boys, meaning Otto and Marvin. Grimes went to where the boys were and told them that the bank had leases for the school land and did not want them to interfere with the crops on it. In that talk Otto said, in substance, that he owned the crops, and Marvin said nothing. The father, John, then came over and pointedly told Grimes to get off the place, and Grimes went. On that day Otto and Marvin were harvesting the rye, having, as the record shows, cut a few "rounds" around the field with a binder.
The only evidence, if it be at all material, as to the maturity of the crop of grains on August 1st, 1924, is this fact of the commencement of harvesting the rye on the 4th of that month, and the testimony of John Wittmayer that, as to the wheat and oats, he would not say that they were "ripe" on August 4th, but that by the time they got through *Page 850 
cutting the rye the other crops would be fit to cut. They finished cutting these crops in the "last part of August."
Before the afternoon of August 5th, John Wittmayer, as he testifies, directed Otto to go over to the Upham bank and see if some settlement could not be made in relation to these crops. That afternoon Otto appeared at the bank and, after much discussion, finally signed two papers which are marked Exhibits 6 and 7 and are in evidence. One of them purports to be a waiver of all claims on the part of Otto to any part of the crops under his father's contracts of purchase or otherwise, and the other is an agreement that Otto shall harvest the grain, the bank furnishing the twine; the grain shall be threshed and all hauled to the elevator and sold, and then, for his services, Otto should be paid one third of the net proceeds of the grains after all expenses were paid. In one of these documents Otto makes the statement that the Upham bank is "the sole owner" of all these crops.
Grimes procured a threshing machine to thresh the grains. Before threshing he told Otto that he had the machine and the time when threshing was to commence. Otto and Grimes say that Otto then told Grimes that he would not be home when the threshing commenced but that he had arranged with his father, John, to look after his, Otto's "share." John denies this, but when the threshing started he was on hand with teams and took more than one third of the grains, hauling them to his own granary. The balance of the grains was hauled to the defendant elevator company, and apparently left therein without the issuance of storage tickets. When the grain was all in John told the buyer at the elevator, not in the presence of Grimes, that that grain was not to be sold until some settlement was made by the Upham bank with him. At the request of the Upham bank, however, the grains were sold and the gross proceeds turned over to the bank, which deducted all expenses including the rent it had paid for the land, and endorsed the balance on John's notes held by it and past due.
Apparently by consent, upon the trial, the amount for which the grains were sold, less expenses, was taken and accepted as the measure of the plaintiffs' damages in case they recovered. Likewise, apparently by consent, it was taken for granted on the trial that the agreement between Otto and the bank was modified so that instead of his getting a share of the money, he should take one-third of the grains in *Page 851 
kind. No complaint is made by either side about this modification.
On December 4th, 1924, all three of the plaintiffs commenced the law action, claiming in their complaint that they were "the lessees" in possession of the lands involved and, as such, owned and were entitled to the exclusive possession of all of the crops, and alleging the conversion of specific grains, which appear to be the grains placed in the elevator, and making a joint demand for damages.
After procuring the leases of the land for 1924, the Upham bank in September, 1924, procured leases of it until January 1st, 1927. This fact seems material only in the equity action.
On the trial all three of the plaintiffs had a verdict and the judgment is in favor of all three of them jointly.
Defendants' pleadings in the law action raise substantially three issues: 1. That the Upham bank was the lessee of the lands and owner of the crops involved under its leases. 2. That the plaintiffs all authorized Otto to make the settlement he did make with the bank. 3. That the plaintiffs, John and Marvin, are estopped to claim that Otto had not authority from them to make such settlement; John, by his disclaimer of any interest in the grains, and Marvin by his silence when it was his legal duty to speak.
Four forms of verdict were submitted to the jury, the first being the one returned, being in favor of all the plaintiffs against both defendants; the second and third being in favor of some, but not all, the plaintiffs, and against the defendants; the fourth being in favor of the defendants.
Each of the plaintiffs in the law action testified that in the spring of 1924 the father agreed with the sons that if they would stay at home and work that summer and put in the crops, each of them should have one third and he the remaining third, and that the arrangement was carried out.
A written charge was given to the jury, of which the following are parts excepted to and assigned as error by the appellants:
"It appears that the plaintiff, John Wittmayer, was in possession of the land in question in the fall of 1923, because of possession which he had obtained under a certain contract for the purchase of the land, and he had never been dispossessed.
"The fact that the bank has or claims to have a lease of said *Page 852 
premises under date of August 1st, 1924, does not give the bank an in the crops because of said lease. Any rights which the bank the crops, it must have because of some contract or arrangement with the plaintiffs.
"The defendant bank would be entitled to the rental value of the land from the time it got the lease, if the lease is good; but this in itself does not give them the crops already growing on the land.
"This is not a suit to determine whether John Wittmayer owed the bank on some other indebtedness; therefore, if John Wittmayer did authorize the bank to take his share, but the bank did not comply with the conditions, then John Wittmayer can recover the value of his share."
Appellants in the law action assign a number of errors but those argued fall within four general heads:
1. Insufficiency of the evidence.
2. The verdict is against the law.
3. Misconduct of the trial court.
4. Errors of law occurring on the trial.
As we think there must be a new trial because of certain errors in the conduct of the trial of the law action, and as the determination of that action determines the equity action, we shall consider only those errors which we deem fundamental, as the others may not occur upon another trial.
It is elementary, in our practice, that a trial court can not assume as a fact proven, anything concerning which the evidence is such that different unbiased minds might find to the contrary. The trial court instructed the jury in the first charge excepted to, in effect that it is a fact that plaintiff John Wittmayer was "in possession" of the land in question in the fall of 1923, because of possession which he had obtained under a certain contract for the purchase of the land, "and he had never been dispossessed." The evidence is such that the jury would have been warranted in finding that Wittmayer's occupancy of the lands at the time specified was as a lessee from and under one Hanson who had it rented from the state for that year. And the jury might well have found that he had no rights under his purchase contract, (except the possible right to pay up and reinstate his contract), and that he had been dispossessed. His purchase contract had been *Page 853 
cancelled, he knew it, he at least permitted Hanson to lease the land for that year for their mutual benefit, and he came into court upon the plea that, in 1924, he and the other plaintiffs were "lessees" of the land and on that basis entitled to the crops. He had arranged with Hanson to lease the land for 1924 but Hanson did not procure any lease. In this charge the trial court invaded the province of the jury, and such invasion was prejudicial error.
The next charge excepted to is vulnerable to the same objection, and to the further one that, on its face, it is a misstatement of the law. If the bank had a valid lease of the land for 1924, dated August 1st of that year, and that lease were a general one without restrictions as to growing crops, such lease as between the state and the bank would give the bank an interest in the crops growing on the land; namely, whatever interest the state had when the lease was made. If, under the circumstances of this case, John Wittmayer was, in law, a mere trespasser on the lands, the state owned all of the crops then growing, and, by the lease itself, without restrictions, passed that ownership to the lessee bank. If we assume, as this instruction does, that the lease to the bank was valid, then, clearly, under the facts in this case, Wittmayer was a mere trespasser on the lands, had only the rights of a trespasser, and the bank, under its lease, succeeded to all the rights of the state, which was the undoubted owner of any crop growing on the land, planted by the trespasser, and unsevered from the realty.
The trial court held the leases to the bank for 1924 invalid and limited the defendants in the law action to a defense based upon some contract with the Wittmayers. The invalidity of the leases was predicated upon the following grounds:
1. They are executed by the land commissioner and not by the board of university and school lands.
2. There was no power in the board or commissioner to rent these lands except at public auction to the highest bidder.
The former ground is untenable. Section 285, Comp. Laws 1913, provides that the Board shall have power to appoint a person to act as "the general agent of the board in the performance of all of its duties pertaining to selection, sale, leasing or contracting in any manner allowed by law, and the general control and management of all matters relating to the care and disposition of the public lands of the *Page 854 
state, all of whose official acts shall be subject to the approval and supervision of the board. The title of such agent shall be `commissioner of university and school lands.'" Other statutes make him secretary of the board. The Commissioner, therefore, as such, has power to execute leases as well as purchase contracts; and, in fact, John Wittmayer's purchase contracts, upon which he says he relies in this action are signed by the Commissioner alone.
The second ground is equally untenable. It seems that the trial court was impressed with the contention of counsel for plaintiffs that Section 161 of the state constitution limits the powers of even the board to lease any lands except at public auction, unless leased for use for pasture or hay land after having been offered at sale pursuant to notice, when no bids were made for such lands. It is conceded that the lands involved in this case were regularly advertised for leasing in March, 1924, and no bids received therefor. In this connection, see § 344, Comp. Laws 1913. We do not think that § 161 of the constitution in any way circumscribes or limits the power of the board to lease lands which were sold, put under cultivation, and have reverted to the state to any greater extent or in any different manner than it circumscribes and limits the board's power with respect to school lands under cultivation at the time the constitution was adopted. Section 161 expressly provides "that all of said school lands now under cultivation may be leased, at the discretion and under the control of the board of university and school lands, for other than pasturage and meadow purposes until sold." As to such lands the board has "general and full powers of sale (or leasing) except as otherwise limited by constitutional or statutory enactment." Fuller v. Board of University School Lands, 21 N.D. 212, 129 N.W. 1029. The leases here involved were valid as against this constitutional objection.
The third instruction excepted to can not be upheld upon this record. The leases to the bank being valid and made while crops, sown by a trespasser on the lands, were growing, the leases containing no restrictions as to crops, but being general, gave the bank title to the growing crops not severed from the land. If the bank had stood idly by and permitted the crops to ripen and the trespasser to sever the grains from the soil, another question might have arisen, but that is not the case.
Other errors are assigned, one among them being misconduct of the *Page 855 
trial court, resulting from a long colloquy between court and counsel in the presence of the jury. As the matter can not arise upon another trial, we pass that as academic.
We are unable to understand upon what possible theory, on this record, all three of the plaintiffs can be permitted to recover. They all claim that they each owned one third of the grains. More than one third was delivered to some one of them under circumstances which make it perfectly apparent that that delivery was accepted as the "share" claimed by one of the plaintiffs, which one being left in doubt. Under such circumstances, to permit that plaintiff who received the one-third of the grains to still recover in this action, permits him to obtain one third of two thirds additional, and prejudices the other two plaintiffs to just that extent. But, as the plaintiffs have not complained, and it is doubtful whether upon this record the defendants can, attention is only called to it so that, upon another trial, the real issues may be clearly defined.
In the law action, the judgment appealed from is reversed and a new trial ordered.
In the equity action, the judgment of dismissal is reversed, a new trial ordered, the action reinstated and the temporary restraining order continued in force pendente lite. As the right disposition of the law action will, apparently, compel the entry of a decree in consonance with the judgment, and as we can not prejudge that determination, we deem it unavoidable to order a new trial instead of entering any decree in this court.
CHRISTIANSON, Ch. J., and NUESSLE, BURKE, and BIRDZELL, JJ., concur.
Mr. Justice BURR did not participate, Honorable CHAS.E. WOLFE, Judge of the Third Judicial District, sitting in his stead.
 On Petition for Rehearing.