[File No. 7266]

State of North Dakota ex rel. RICHARD P. RAUSCH, Appellant, v. AMERADA PETROLEUM CORPORATION, a corporation, Board of University and School Lands of North Dakota, composed of C. NORMAN BRUNSDALE, Governor, E. T. CHRISTIANSON, Attorney General, M. F. PETERSON, Superintendent of Public Instruction, TOM HALL, Secretary of State, and BERTA BAKER, State Auditor, and their respective successors in office; E. T. CHRISTIANSON as Attorney General of North Dakota, and his successor in office, Respondents.

(49 NW2d 14)

Opinion filed August 9, 1951

*Nels G. Johnson,* for appellant.

*E. T. Christianson,* Attorney General, and *Helgi Johanneson,*

Assistant Attorney General, for respondents, Board of University and School Lands and *E. T. Christianson* as Attorney General.

*Cox, Cox, Pearce & Engebretson,* and *Harry D. Page* and *Jack Langford,* for respondent, Amerada Petroleum Corporation.

MORRIS, C.J., In this action the relator challenges the validity of a lease executed for the State of North Dakota by the Commissioner of University and School Lands, granting to A. M. Fruh and Thomas W. Leach, as lessee, the right, under certain conditions, to explore, mine, and operate for oil and gas upon certain lands belonging to the state, which lease has been assigned to and is now owned by the Amerada Petroleum Corporation.

The relator, after setting forth the corporate capacity of the Amerada Petroleum Corporation, the establishment of the Board of University and School Lands as an agency of the State of North Dakota, the official capacity of the attorney general and his refusal upon demand to institute and maintain this action, and the capacity of the relator as a taxpayer who brings the action for himself and on behalf of other taxpayers similarly situated, pleads facts upon which his asserted right to relief is predicated. He alleges that the State of North Dakota, acting through the Board of University and School Lands and the State Land Commissioner, executed and delivered a lease, dated November 10, 1948, covering the following described lands in Williams County, to-wit: the N½, N½SE¼, SW¼SE¼, SW¼ Section 36, Township 155N, Range 96W, and numerous other oil and gas mining leases in other counties of the state, each of which has been assigned to and is owned by the Amerada Petroleum Corporation. It is also alleged that each of these leases is upon lands in the possession of and owned by the State of North Dakota, which were acquired by it as a part of the lands granted for the support of the common schools by the United States of America to the State of North Dakota, pursuant to the Enabling Act, being an Act of the Congress of the United States of America, approved February 22, 1889, and known as Chapter 180, 25 U. S. Statutes at Large, p 676, and

accepted by the State of North Dakota through the adoption of its constitution. (Section 205, N. D. Const.)

It is further alleged that the leases in question were made by the Board of University and School Lands and the State Land Commissioner in accordance with the provisions of Chapter 15–05 RCND 1943, and that the law as set forth in that chapter has been complied with.

The complaint further states: "That the State of North Dakota is the owner of each of said tracts of land, or of one-half of the oil, gas and other minerals thereunder, and in possession thereof, subject only to Amerada Petroleum Corporation's said leases, and that said corporation asserts the validity of its said oil and gas leases and claims the right to exercise the rights and privileges granted thereby."

It is then further alleged: "That, however, said oil and gas leases, and each of them, are invalid and of no effect because issued without valid authority of law, and particularly without valid statutory authorization because the said legislative enactments are in conflict with and contrary to the provisions of the Enabling Act and the Constitution of North Dakota, specifically Section 11 of the Enabling Act and Section 161, Article IX of the Constitution."

The plaintiff then seeks to have the leases of the Amerada Petroleum Corporation adjudged null and void.

The Amerada Petroleum Corporation admits the execution of the leases alleged in the complaint and the assignments thereof to the corporation and alleges that they are lawfully executed on behalf of the State of North Dakota by the Board of University and School Lands and that the corporation has "complied with each and all of the terms and provisions of said oil and gas leases, including the payment of rentals therein provided for the privilege of deferring commencement of a well; and that each and all of said oil and gas leases were and are valid and subsisting leases."

The Board of University and School Lands and the Attorney General, by joint answer, admit the execution of the leases and allege the regularity and validity of their execution.

The complaint describes but one specific lease and land that

it covers. There is on file a stipulation of facts signed by all of the parties admitting the execution and assignment of this lease and identifying photostatic copies of the lease, assignment, and a consent to the assignment signed by the State Land Commissioner. Both the pleadings and the stipulation also set forth that the Amerada Petroleum Corporation is the owner, as assignee, of other oil and gas leases similarly given by the State of North Dakota covering original grant lands which the state still owns, and also lands that were originally granted from the United States Government and which have been sold to private persons, and in which the state has reserved an undivided one-half of the oil, gas, and other minerals. These leases are not described with particularity, nor are the lands which they cover identified. As to those leases covering an interest in the oil and gas of lands that have been sold by the state, the purchasers or the owners are not identified and have not been made parties to the action. The court will not undertake to determine the validity or invalidity of specific leases which may or may not involve rights of persons not parties to this action upon the general allegation that they are similar to the lease set forth and described in detail in the complaint. This decision will be confined to a determination of the validity of the one lease described and identified in the complaint and stipulation.

Oil and natural gas are generally classified as minerals. 24 Am Jur, Gas and Oil, Sec 1; 58 CJS, Mines and Minerals, Sec 2. A list of authorities supporting this assertion may be found under the heading "Mineral" in Words and Phrases, Permanent Edition, Vol 27, p 215. The lease in question gives to the lessee the right to explore and exploit the oil and gas resources underlying the land described therein for a term of five years, and as long thereafter as oil or gas or either of them is produced from the land by the lessee. The lease provides for payment to the state, under certain conditions, of one-eighth of the gas and oil produced from the premises, and in event drilling is deferred beyond a certain date, an annual rental of twenty-five cents per acre.

The land covered by the lease is a part of the original land grant by the United States of America to the State of North

Dakota for the support of the common schools of the state and, as such, is under the control of the Board of University and School Lands, subject to constitutional and statutory limitations. Section 156 ND Const; Section 15-0102 RCND 1943. The Commissioner of University and School Lands acts as general agent of the board under its direction and authority.

Section 15-0509 RCND 1943 provides that: "The board of university and school lands may lease any lands under its control believed to contain oil, gas, coal, cement materials, sodium sulfate, sand and gravel, road material, building stone, chemical substances, metallic ores, or colloidal or other clays, and may make and establish rules and regulations for development and drilling operations."

The execution of the lease by the Board of University and School Lands appears to be in accord with the letter and spirit of the laws enacted by the legislature pertaining to this subject.

The relator challenges the validity of the lease, regardless of statutory law, upon two basic and fundamental grounds. The first is that the state was without power to make the lease because of the inhibitions of Section 11 of the Enabling Act; and the second is that the Board of University and School Lands, either with or without legislative sanction, has no power to lease original grant lands for the exploration and exploitation of their underlying resources of oil and gas, because of the specific and the implied inhibitions of Section 161 of the state constitution.

We will first consider the Enabling Act and its effect upon the right of the State of North Dakota to lease lands granted by the act for the purpose of exploring for and extracting gas and oil. Section 10 of the Enabling Act (Vol 3, p 1693, RCND 1943) Statutes at Large, Vol 25, p 679, granted to the State of North Dakota, upon its admission to the union, sections numbered 16 and 36 in every township, or other lands in lieu thereof, where for certain reasons these numbered sections could not be granted. The purpose of the grant was for the support of the common schools. The land involved in the lease before us is a part of this grant. Section 18 of the Enabling Act provided: "That all mineral lands shall be exempted from the grants made by this act."

The authority to determine the fact as to what lands were mineral lands, and therefore exempted from the grant to the state, rested with the Secretary of Interior. West v. Standard Oil Co. 278 US 200, 49 S Ct 138, 73 L Ed 265.

"The Land Department uniformly has ruled that the States acquire a vested right in all school sections in places which are not otherwise appropriated, and not known to be mineral, at the time they are identified by the survey,—or at the date of the grant where the survey precedes it,—regardless of when the matter becomes a subject of inquiry and decision, and that this right is not defeated or affected by a subsequent mineral discovery." Wyoming v. U. S., 255 US 489, 41 S Ct 393, 65 L Ed 742. Also 50 CJ, Public Lands, Section 168; 36 Am Jur, Mines and Minerals, Section 16.

It does not appear that the United States has in any way questioned the title of the State of North Dakota, and these citations are of importance as indicating the law and practice with respect to the determination of what lands were exempted from the grant as mineral lands. It is clear that the congress, when it passed the Enabling Act, did not intend to grant to the states mineral lands which were then known to be such. Section 11 of the Enabling Act originally provided:

"That all lands herein granted for educational purposes shall be disposed of only at public sale, and at a price not less than $10 per acre, the proceeds to constitute a permanent school fund, the interest of which only shall be expended in the support of said schools. But said lands may, under such regulations as the legislature shall prescribe, be leased for periods of not more than five years, in quantities not exceeding one section to any one person or company; and such lands shall not be subject to preemption, homestead entry, or any other entry under the land laws of the United States, whether surveyed or unsurveyed, but shall be reserved for school purposes only."

Did Congress, by the enactment of this section, intend to restrict the right of the state to lease grant lands for the purpose of exploring for and developing underlying minerals such as gas and oil? The Supreme Court of New Mexico has twice answered that question in the negative. In Neel v. Barker, 27 NM 605,

204 Pac 205, the court reached the conclusion that the provisions of the Enabling Act of that state, with reference to the sale and leasing of lands granted to the State of New Mexico for the support of the common schools, do not apply to a lease for mineral purposes.

In following and commenting upon Neel v. Barker, supra, the Supreme Court of New Mexico, in State ex rel. Otto v. Field, 31 NM 120, 241 Pac 1027, said:

"In that case we said that the restrictions and limitations of that act, in regard to the sale, lease, conveyance, or contract of or concerning any of the lands granted or the use thereof or the natural products thereof, do not apply to a grant or lease to explore for oil and gas executed by the commissioner of public lands of New Mexico, for the reason that, when that act was formed and enacted, it was not contemplated that any lands, mineral in character, should be granted to the state, and that it would be inconsistent to say that Congress intended by said section 10 to provide that the formalities described in that section should apply to minerals in the land, and that therefore the mandatory directions in section 10 have no application to the mineral estate in the land."

It would appear, however, that the Congress of the United States has not accepted the view of the Supreme Court of New Mexico and has pursued what the reasoning of the New Mexico cases would indicate was an inconsistent course of action by amending Section 11 of our Enabling Act to provide for mineral leases. We find these amendments to our Enabling Act pertaining to mineral leases: August 11, 1921, appearing in 42 Statutes at Large, p 158; May 7, 1932, 47 Statutes at Large, p 150; and April 13, 1948, 62 Statutes at Large, p 170, the last amendment to Section 11 being as follows: "Except as otherwise provided herein, the said lands may be leased under such regulations as the legislature may prescribe. Leases for the production of minerals, including leases for exploration for oil, gas, and other hydrocarbons and the extraction thereof shall be for such term of years and on such conditions as may be from time to time provided by the legislatures of the respective States; leases for grazing and agricultural purposes shall be

for a term not longer than ten years; and leases for development of hydroelectric power shall be for a term not longer than fifty years."

Under the theory of the Supreme Court of New Mexico, congress exempted known mineral lands from its grants and did not contemplate that lands mineral in character would become the property of the states, and such restrictions as it saw fit to place upon the leasing of granted lands were not intended to apply to leases for the exploration or development of minerals subsequently discovered to exist beneath the surface of those lands. The state was therefore left free to provide for the development of the mineral resources beneath granted lands as it might see fit.

On the other hand, congress has removed all doubt as to the right of a state to enter into leases for the production of minerals, including leases for the exploration for oil and gas, by amending the Enabling Act. The Legislature of North Dakota, insofar as the Enabling Act and its amendments are concerned, had full power to provide for the execution of oil and gas leases.

We now come to the question of whether the Constitution of the State of North Dakota permits the legislature to provide for the leasing of lands granted to the state for educational and charitable purposes for the exploration and the exploitation of gas and oil resources. When the grant of the land in question to the State of North Dakota in 1889 became effective, it vested title in the state, subject only to the reservations and limitations of the Enabling Act. The legislature became vested with power to deal with the land, subject to those reservations and limitations, and subject also to the provisions of the constitution of the state. It becomes pertinent here to consider the general nature of those constitutional provisions before considering them in detail.

Early in the history of this court it laid down the rule that: "In passing upon the constitutionality of any statute, there are certain elementary principles of which courts must ever be mindful. These principles render that certain which otherwise might be uncertain; that simple which otherwise might be com-

plex; that safe which otherwise might be dangerous. We must remember that legislative power is primarily plenary, and that constitutions are not grants of, but restrictions upon, that power. Hence he who would challenge a legislative enactment must be able to specify the particular constitutional provision that deprived the legislature of the power to pass the enactment. We must remember that it is the duty of courts to reconcile statutes with the constitution when that can be done without doing violence to the language of either, and in all cases of doubt, the doubt must be resolved in favor of the constitutionality of the statute." Martin v. Tyler, 4 ND 278, 60 NW 392.

This rule has been followed in many subsequent cases. State ex rel. Montgomery v. Anderson, 18 ND 149, 118 NW 22; State ex rel. Gaulke v. Turner, 37 ND 635, 164 NW 924; State v. First State Bank of Jud, 52 ND 231, 202 NW 391; Baird v. Burke Co., 53 ND 140, 205 NW 17; Aubol v. Engeseth, 66 ND 63, 262 NW 338, 100 ALR 853; State ex rel. Johnson v. Baker, 74 ND 244, 21 NW2d 355.

"When it is asserted that action which is authorized by a legislative enactment is forbidden by the constitution, we do not look in the constitution for a grant of power to the legislature to enact such law, we look only to ascertain if it inhibited the legislature from enacting the law." Stark v. City of Jamestown, 76 ND 422, 37 NW2d 516.

The relator argues that the action of the legislature in authorizing the Board of University and School Lands to enter into gas and oil leases, as provided by Chapter 15–05 RCND 1943, is violative of Section 161 of the North Dakota Constitution. This section consists of two paragraphs. The first paragraph was formulated by the Constitutional Convention of 1889 and remains unchanged. It reads as follows: "The legislative assembly shall have authority to provide by law for the leasing of lands granted to the state for educational and charitable purposes; but no such law shall authorize the leasing of said lands for a longer period than five years. Said lands shall only be leased for pasturage and meadow purposes and at public auction after notice as heretofore provided in case of sale; provided, that all of said school lands now under cultivation may be leased,

at the discretion and under the control of the Board of University and School Lands, for other than pasturage and meadow purposes until sold. All rents shall be paid in advance."

On March 16, 1920, this paragraph was added by amendment: "Provided, further, that coal lands may also be leased for agricultural cultivation upon such terms and conditions and for such a period, not exceeding five years, as the legislature may provide."

Article IX, consisting of Sections 153 to 165 inclusive, deals with school and public lands. It creates a trust fund of all proceeds of public lands granted by the United States for the support of the common schools of the state. It creates the Board of University and School Lands, and, in a general way, defines its authority. In Section 155, we find this provision:

"The legislative assembly shall provide for the sale of all school lands subject to the provisions of this article. The coal lands of the state shall never be sold, but the legislative assembly may by general laws provide for leasing the same. The words coal lands shall include lands bearing lignite coal."

It must at least have been considered doubtful that the word "leasing" in this provision was sufficiently broad to include leases for agricultural cultivation, otherwise the amendment of Section 161 would have been unecessary. The constitution clearly makes a distinction between leasing coal lands for the extraction of coal and leasing them for agricultural cultivation. "Leasing" in Section 155 means the former and does not include the latter.

We would here observe that Section 155 has never been amended since the adoption of the constitution. It places a restriction upon the sale of coal lands, but other minerals are not mentioned. The restriction was added by way of amendment to the original draft proposed to the constitutional convention by delegate Williams, who, in support of his amendment, said: "At the present time these coal lands are regarded as not possessing any great value, but it is a fact that they are being bought up by syndicates, and as a matter of looking to the future I think it would be well to reserve these lands from

sale in order to protect the fuel supply, and allow the State of the future to lease them. It seems to me under such rules and regulations as the Legislature may prescribe, it would be wise to protect these lands and allow the title to remain in the State." Proceedings and Debates of the First Constitutional Convention of North Dakota, p. 604.

This amendment appears to have been adopted without further debate. It is a fair inference that the members of the convention approved the purpose stated by the proponent that it was to protect the fuel supply by preserving title in the state.

Discussion among the delegates was quite extensive with reference to the formulation of the various constitutional provisions dealing with school and public lands. With the exception of the discussion of coal which we have noted, the remarks of the delegates deal wholly with sale and rental for purposes pertaining to activities on the surface of the land. Exploration for or the extraction of minerals other than coal seems not to have been considered. The failure of the delegates to consider this subject is readily understood when we note the fact that the convention was formulating a constitution that would be consistent with the Enabling Act and that Section 18 of that act specifically exempted all mineral lands from the grants to the state.

The constitution of the state is subject to construction by the courts, whose duty it is to discover and give effect to the intention of the people who adopted it. Egbert v. Dunseith, 74 ND 1, 24 NW2d 907; Dawson v. Tobin, 74 ND 713, 24 NW 2d 737.

In State ex rel. Miller v. Taylor, 22 ND 362, 133 NW 1046, in paragraph 1 of the Syllabus by the Court, it is said: "When the meaning of words or terms employed in the Constitution is uncertain or ambiguous, resort may be had to the debates of the convention which framed and submitted the Constitution, as an aid in determining their meaning; and for the same purpose the interpretation placed upon such provisions by several sessions of the legislative assembly and by the people in voting thereon is entitled to great weight; and the intent, if it can be

gathered from such proceedings, without doing violence to the words employed, is controlling." Also State ex rel. McCue v. Blaisdell, 18 ND 31, 119 NW 360; State ex rel. Linde v. Robinson, 35 ND 417, 160 NW 514; State ex rel. Martin v. Heil, 242 Wis 41, 7 NW2d 375.

The debates indicate that the framers of the constitution used the word "lease" in Section 161 as pertaining to surface rights, and when the people amended the section in 1920, the amendment also, consistent with the original section, pertained only to leases for the cultivation of the surface. It may be noted here that the constitutional convention did not write into the constitutional all of the restrictions regarding school lands that were provided by the Enabling Act, the tendency being to adopt a policy of liberality rather than restriction, with respect to the power of the legislature to deal with school and public lands. This policy of liberality is illustrated by an incident that is disclosed on page 609 of the debates of the convention. Section 11 of the original Enabling Act provided that school lands should be leased in quantities not exceeding one section to any one person or company. It was sought by amendment of the original draft to insert a similar provision in the constitution. In the course of the debate it was pointed out that the restriction was already provided for in the Enabling Act. The amendment was rejected when confronted with this argument:

"It is not necessary because Congress has used certain language that we should use the same language. Congress may see fit to change this. They do not know that a great amount of the land we are to get will be fit for nothing else but grazing, and when this is explained they will modify it, but if we tie it up in our Constitution we cannot modify it ourselves—we cannot pass an act as Congress can, and by a single bill do away with that part of the Constitution and allow our Legislature to lease these lands in larger quantities. If Congress sees fit not to change this it is not necessary to put it in our Constitution. But if they do see fit to change it we don't want to tie ourselves up." Proceedings and Debates of the First Constitutional Convention of North Dakota, p. 609.

Thus the framers of the constitution were already anticipat-

ing amendments to the Enabling Act pertaining to school lands. It may also be noted that their wisdom in this respect was justified, for congress later, by amendment, eliminated the restriction.

We refer again to the language of Section 161 upon which the relator relies. The first and original paragraph of that section, in effect, divided lands that had been granted to the state for educational and charitable purposes into two classes, dependent upon the use, if any, that had been made of the surface. The legislative assembly was given authority to provide for the leasing of land for pasturage and meadow purposes at a public auction after the same notice as was elsewhere provided for in case of sale. Lands under cultivation at the time of the adoption of the constitution were placed in a different class and could "be leased, at the discretion and under the control of the Board of University and School Lands, for other than pasturage and meadow purposes until sold." Lands falling in the second class could clearly be leased without restriction as to the purpose of the lease. If the provisions of Section 161 apply to leases for the development of underlying minerals, they create an absurd situation and a classification of lands wholly without reason. There was good reason for dividing surface leases into those pertaining to pasture and meadow purposes, on the one hand, and those pertaining to lands that were under cultivation at the time of the adoption of the constitution on the other. It might well be that the framers of the constitution decided, as a matter of policy, that the pasturage and meadow lands should not be broken up and placed under cultivation until they were sold, but that lands already under cultivation should continue to be cultivated rather than lie idle and become seed beds for noxious weeds. These cogent reasons for classifying the land with respect to surface leases have no application to leases for the development of subsurface minerals. We do not believe that the framers of the constitution or the people who adopted it intended such an unreasonable result. We will presume that the result intended was reasonable and will, if possible, give the constitution such construction as will produce

that result. Mitchell v. Lowden, 288 Ill 327, 123 NE 566; U. S. v. Wainer, 49 Fed 2d 789.

Wittmayer v. Security State Bank, 54 ND 845, 211 NW 436, while not directly in point, is of value as indicating that this court is inclined to construe Section 161 in a reasonable manner and in a way designed to implement the spirit and purpose of the section. The land involved in that case had been sold on contract and placed under cultivation by the purchaser. It was not under cultivation at the time the constitution became effective. The Board of University and School Lands entered into a lease without the formalities required with respect to lands leased for pasturage and meadow purposes, and the court held that the provisions with regard to the leasing of lands for such purposes did not circumscribe or limit the power of the board to lease lands which had been sold, put under cultivation, and had reverted to the state, and that the board had the same power to lease reverted lands that had been placed under cultivation by the purchaser as it had with respect to school lands under cultivation at the time the constitution was adopted. In other words, the status of the land with respect to cultivation at the time the constitution was adopted was not immutable and did not control forever and under all circumstances the procedure and authority under which a lease might be executed.

The relator also challenges the validity of those portions of Chapter 15–05 RCND 1943 which provides for the leasing of lands under its control by the Board of University and School Lands for the purpose of extracting gas, oil, and certain other products upon the ground that these statutes constitute an unwarranted delegation of legislative power to the board. It is charged that the statutes fail to specify or set up standards on which leases may be granted, that no minimum price is fixed, and that the annual payments are to be determined by the board. The answer to this contention is found in Section 156 of the constitution, which creates the Board of University and School Lands and provides that: "subject to the provisions of this article and any law that may be passed by the legislative assembly, said board shall have control of the appraisement, sale, rental and disposal of all school and university lands, and shall

direct the investment of the funds arising therefrom in the hands of the state treasurer, under the limitations in section 160 of this article."

Thus the constitution vests in the Board of University and School Lands general authority over the appraisement, rental, sale, and disposal of all school and university lands, subject to the provisions of Article IX of the constitution and subject to any law that may be passed by the legislative assembly. The source of authority of the board is the constitution itself and not the legislature. When the legislature acts with respect to the powers of the board, it acts in a restrictive capacity and not as a conferrer of authority. Fuller v. Board of University and School Lands, 21 ND 212, 129 NW 1029. Therefore it cannot be said that the legislature in providing certain procedures for the leasing of school lands for gas and oil has attempted an unconstitutional delegation of power to the board.

The constitution providing as it does through Section 161 for certain restrictions upon the leasing of lands granted to the state for educational and charitable purposes deals exclusively with leases for pasturage, meadow purposes, and purposes of cultivation. References to leasing contained in that section do not embrace or include leases for the purpose of exploring for or exploiting subsurface minerals. We agree with the trial court that the lease dated November 10, 1948, to A. M. Fruh and Thomas W. Leach, covering the N½; N½SE¼, SW¼SE¼, SW¼ Section 36, Township 155 N, Range 96W, Williams County, North Dakota, executed by the Commissioner of University and School Lands in behalf of the State of North Dakota, recorded in the office of the Register of Deeds of Williams County in Book 4 of Miscellaneous, page 138, and subsequently assigned with the consent of the commissioner to the Amerada Petroleum Corporation, is not violative of any provision of the Constitution of the State of North Dakota or the Enabling Act of 1889, as amended, by the terms of which said lands were granted to the State of North Dakota, and that said lease is a valid and subsisting lease issued in conformity with the law of this state. To the extent of this determination the judgment appealed from is affirmed.

The judgment also provides that oil and gas leases given by the Board of University and School Lands covering original grant land and now owned by Amerada Petroleum Corporation are valid and subsisting leases. There is no showing in the record regarding the specific lands covered by these leases or when they were executed. Neither does it appear whether other parties may be interested in the leases or the subject matter thereof. It is proper that the judgment be restricted to a determination of the validity of the lease specifically described in the pleadings, the stipulation of the parties, and the findings of fact, which is the lease above set forth.

The case is remanded to the district court with instructions to modify the judgment to conform herewith.

BURKE, SATHRE, CHRISTIANSON and GRIMSON, JJ., concur.