**Robert P. McCARNEY, on behalf of the Committee for the Petitioners, Petitioner,**

**v.**

**Ben MEIER, as Secretary of State of the State of North Dakota, Respondent.**

Civ. No. 9679.

Supreme Court of North Dakota.

Dec. 12, 1979.

---

Lundberg, Conmy, Nodland, Rosenberg, Lucas & Schulz, Bismarck, for petitioner; argued by Patrick A. Conmy, Bismarck.

Allen I. Olson, Atty. Gen., and Murray G. Sagsveen, Sol., Bismarck, for respondent; argued by Murray G. Sagsveen, Sol., Bismarck.

PEDERSON, Justice.

This is an original proceeding under Article 105, Constitution of North Dakota, to review the decision of the secretary of state (Meier) that the petition to refer House Bill 1221, which was passed at the Forty-sixth Session of the Legislative Assembly, popularly called the "Cross Ranch Bill," was insufficient and would not be placed on the ballot for a vote of the people. We reverse

the decision and direct that the matter be placed on the ballot.

The bill appropriated moneys in the Vietnam bonus fund for the "acquisition of the cross ranch and other land for designation as the veterans memorial state park" (Ch. 39, S.L.1979). Shortly after its passage and approval, a sponsoring committee (McCarney) was formed to refer the bill to a vote of the people.

As required by Article 105 of the Constitution, the petition was first presented by McCarney to Meier for approval as to form. The significant part of the petition form for our purposes, which was approved by Meier, contained the following:

"

| Month<br>Day<br>Year | NAME OF ELECTOR | RESIDENCE<br>(Identify by Street No.,<br>Twp., or Precinct) | P.O. ADDRESS<br>CITY—STATE |
|---|---|---|---|
| 3/24/79 | JOHN DOE (SAMPLE) | Hay Creek Twp., Burleigh Co. | Bowman, N.D. |
| 1 | | | |
| 2 | | | " |

At the time McCarney filed the petitions in Meier's office on July 8, 1979, they bore 13,270 signatures, 914 more than were required to refer the measure. None of the signatures has been found to be invalid, but 1,150 were rejected because of incomplete addresses. The remaining signatures accepted by Meier were insufficient under Article 105 to allow the "Cross Ranch Bill" to be referred to the electors.

Meier returned the petitions to McCarney on July 23, 1979, "for correction or amendment" as provided in Section 6, of Section 1,[1] of Article 105, allowing 20 days to obtain complete post-office addresses for signers from the larger cities in the state who had inserted only city and state in the column headed "P.O.ADDRESS" and gave no street address in the column headed "RESIDENCE."

Meier instructed McCarney that each petition that required correction must be returned to the same person who circulated that petition so that the circulator could have each signer, whose address needed to be completed, write in his or her complete address. McCarney did not comply with

Meier's instructions but re-filed the petitions on August 8, 1979, after the committee had inserted house numbers and street addresses, by the use of directories, for the signers who had failed to do so.

When no further attempt was made to "correct" the petitions in the manner suggested by Meier, on August 24, 1979, McCarney was informed that the petitions were rejected and the referral would not be placed on the ballot. McCarney petitioned this court for review.

*Scope of Review Under Article 105*

Section 6 of Article 105, Constitution of North Dakota, provides in part:

"All decisions of the secretary of state in regard to any such petition shall be subject to review by the supreme court. . . . If proceedings are brought against any petition upon any ground, the burden of proof shall be upon the party attacking it."

Section 7 of Article 105 states in part that:

"All decisions of the secretary of state in the petition process are subject to review

---

1. Article 105 is divided into four main sections with numerous subsections found under Section 1. However, these subsections are designated by the titles "Section 1, 2, 3, 4, etc."

Thus, all sections referred to in this opinion are actually subsections of the main heading "Section 1."

by the supreme court in the exercise of original jurisdiction."

Meier submits that in reviewing the secretary of state's determination this court is governed by the "abuse of discretion" standard enunciated in *Hernett v. Meier*, 173 N.W.2d 907 (N.D.1970). In *Hernett*, the issue was whether or not signatures on a referendum petition complied with a statute, § 16–01–11, NDCC. It appears that the proper standard of review was not raised as an issue.

■ Under the principle of separation of powers, courts do not substitute their judgment for that of an executive officer who has exercised a discretionary function. See *Appeal of Johnson*, 173 N.W.2d 475 (N.D. 1970). That has no application, however, to ministerial acts.

In *State v. Hanna*, 31 N.D. 570, 154 N.W. 704 (1915), the issue raised was whether or not the secretary of state's action in filing and canvassing referendum petitions pursuant to § 25 of the Constitution [2] was discretionary, and whether or not his decision was conclusive on this court. This court found that his decision was not conclusive and, in holding that the duties fixed by § 25 are ministerial, said:

"That a question of law may arise, as here, upon the sufficiency of the petition vests no discretion in said official in acting under it." 154 N.W. at 705.

There is authority for the proposition that the placing of a proposal on the ballot by the secretary of state is a ministerial, not a quasi-judicial, act. *State ex rel. Williams v. Brown*, 52 Ohio St.2d 13, 6 Ohio Cas.3d 79, 368 N.E.2d 838 (1977). See also, 42 Am.Jur.2d, Initiative and Referendum, § 47.

■ We are not bound by the secretary of state's interpretation of the Constitution, and the "abuse of discretion" standard has no application here.

■ It has been suggested that, in effect, Meier's determination is a proceeding against the petition and thus the "burden of proof" is upon him pursuant to the provision in Section 6 of Article 105, which states: "If proceedings are brought against any petition upon any ground, the burden of proof shall be upon the party attacking it." We do not agree that there is a burden of proof upon anyone in this case where the principal question is entirely one of law, and to the extent that there are disputes as to the facts, they are not material to our determination.

*Canons of Constitutional Construction*

■ Principles of construction applicable to statutes are generally available to construction of the Constitution. The court must give effect and meaning to every provision and reconcile, if possible, apparently inconsistent provisions. *State ex rel. Sanstead v. Freed*, 251 N.W.2d 898 (N.D.1977). It is the duty of the court to discover and give effect to the intention of the people without doing violence to the words employed. *State v. Amerada Petroleum Corp.*, 78 N.D. 247, 49 N.W.2d 14 (1951). All rules of construction are subservient to this duty to ascertain and give effect to the intent and purpose of the framers and the people who adopted the Constitution. *Newman v. Hjelle*, 133 N.W.2d 549 (N.D.1965). Expediency has no application nor does public clamor, majority desire, or apparent need. *State v. Olson*, 44 N.D. 614, 176 N.W. 528, 534 (1920).

*Historical Background*

Originally, neither § 25 nor § 202 reserved to the people any power to initiate or refer legislative measures or to initiate constitutional amendments. In 1914 amendments were made to both of these sections so that these powers were acquired by the people (Article 15, Nov. 3, 1914, S.L.1911, Ch. 93, S.L.1913, Ch. 101; Article 16, Nov. 3, 1914, S.L.1911, Ch. 89, S.L.1913, Ch. 98).[3]

---

**2.** Insofar as Article 105 relates to the reservation in the people of the power to refer measures enacted by the legislature, it supersedes Section 25 of the Constitution.

**3.** One might be interested to note that in *State v. Summers*, 33 S.D. 40, 144 N.W. 730 (1913), the South Dakota court states that South Dakota was the first state in the Union to adopt the initiative and referendum.

The amendment of § 202 to provide a means for the people to initiate amendments to the Constitution was challenged in *State v. Hall*, 44 N.D. 459, 171 N.W. 213 (1919),[4] although the court stated that its remarks applied equally to § 25 on initiative and referendum powers. This court prefaced its decision by calling attention to the provisions of § 2 of the North Dakota Constitution, which says:

"All political power is inherent in the people. Government is instituted for the protection, security and benefit of the people, and they have a right to alter or reform the same whenever the public good may require."

Justice Grace, writing for the majority, said:

"The words of section 2 have the deepest significance; the words have such a profound meaning, and are such a lucid revealment of the place where political power is lodged for the benefit of the people, as should make a vivid impression on the minds of all. Each generation of people inherit this great and far-reaching political power from the preceding generation. As an inheriting generation, it is part of their birthright to receive such power; to protect it with all their intelligence; to preserve it; to enjoy it, and hand it down to the future generation, to posterity, unimpaired. In this connection it would be well for all who, for a time, are invested with authority and commissioned by the will of the people to exercise for the people and for their benefit some of the inherent power of the people, to comprehend that all such persons, so briefly commissioned with such authority, are but the agents and instrumentalities selected by the people to perform certain duties for the people. In this sense, Governors of states, Legislatures, and courts, and each and every other person engaged in performing a public duty prescribed by the people, is, at all times, the agent only of the people, to exercise for the people such delegated political power as the people, in their sovereign capacity, may determine shall be exercised by such agents or any of them. All political power being in the people, they may delegate what powers they deem best; they may also repossess themselves, wholly or partially, of a delegated power by a consent of the majority of all the people, in whom is inherent all political power, such consent to be expressed in the manner provided by law." 171 N.W. at 214–215.

In declaring the amendment of § 202 effective, this court looked to the object of the amendment, i. e., to acquire for the people a concurrent power with the legislature to initiate amendments to the Constitution. In holding that the provision should be construed to uphold this purpose, it said:

"The constitutional provision, therefore, should not be construed so as to defeat its evident purpose, but should be construed so as to make it operative and effective, and to overcome the difficulty which it was intended to obviate." 171 N.W. at 218.

The history and purpose of the amendment was described in *State v. Hall, supra,* as follows:

"Again, in construing the Sixteenth Amendment, the contemporaneous history should be taken into consideration; the insistent demand of the people to be allowed the right to propose amendments to the Constitution, the history of the resolutions proposing the amendments in the legislative assembly, the fact that campaigns were waged partly on the issue of adopting the proposed amendment, are all matters which may receive consideration in the construction of a constitutional amendment." 171 N.W. at 218.

4. In *State v. Hall*, 35 N.D. 34, 159 N.W. 281 (1916), § 202 was held not to be self-executing and, therefore, ineffective. This decision was overturned in the above case. See *State v. State Board of Canvassers*, 44 N.D. 126, 172 N.W. 80, 96 (1919), concurring opinion of Justice Bronson.

One of the concurring justices, Robinson, wrote:

"But section 202 was framed for submission to the common people, who had asked for bread and did not expect to be given a stone. For years they had made a strenuous and determined fight for the initiative and referendum, and they did not look for their public servants to offer them for approval a thing in the form of a snare, a trap, or a delusion. . . .

"Hence it behooves the courts to give to section 202 a broad and liberal construction, so as to advance and secure the purposes and intentions of those who adopted the amendment." 171 N.W. at 233.

The authors of 16 C.J.S. Constitutional Law, § 14, writing about initiative and referendum, omitting supporting footnotes, say:

"*Initiative and referendum* provisions should be liberally construed; and any doubt should be resolved in favor of the exercise of this right by the people. As a general rule such provisions in a constitution should be construed as a whole. The exercise by the people of the power thus reserved will not be interfered with except on a clear showing of a violation of the law, but the rule that such provisions will not be so construed that the real intention of a referendum petition may not be defeated by a mere technicality will not extend to permission of substantial violations of constitutional requirements." [Emphasis in original.]

See also, 82 C.J.S. Statutes, § 117, and 42 Am.Jur.2d, Initiative and Referendum, § 5.

### Conclusions

■ With this admonition in mind that constitutional provisions should be construed to effect their purpose, and in view of the history of the initiative and referendum which shows that these were provisions the people fought strongly for, Article 105 should be given a broad and liberal construction. As was stated by the Supreme Court of Oklahoma in *In Re Initiative Petition No. 23, Etc.*, 35 Okl. 49, 127 P. 862, 866 (1912):

"The right of direct legislation in the people must be administered by the officers charged with that duty in such manner as to make it operative. If technical restrictive constructions are placed upon the laws governing the initiation and submission of these measures, the purpose and policy of the people in establishing the same will be entirely defeated, and instead of becoming an effective measure for relief from evils, under which they have heretofore suffered, there will be naught but an empty shell . . . Those who circulate the petition will necessarily be drawn from the ranks of volunteers or those who, for a very small consideration, call attention to their fellow citizens to the measure proposed, and solicit their interest therein. Necessarily even with the best safeguards that can be thrown around the circulation of petitions, where such a large number of names are required, inaccuracies and technical departure from prescribed forms are certain to occur every time a petition is circulated. . . . All of these things are proper to be noted and taken in consideration in the administration of this law. It can be made effective or defeated by the officers charged with its administration, and it is our duty to sustain it, rather than destroy, if it can be accomplished within the law."

In the instant case, volunteers circulated the petitions to refer the Cross Ranch Bill, and obtained 13,270 signatures, of which 1,150 were rejected by the secretary of state as he deemed that these individuals had failed to correctly sign the petitions in that they did not give complete post-office addresses. At issue here is the construction of Section 3 of Article 105, which section provides as follows:

"The petition shall be circulated only by electors. They shall swear thereon that the electors who have signed the petition did so in their presence. *Each elector signing a petition shall also write in the date of signing and his post-office address.*" [Emphasis added.]

All provisions in Article 105 are expressly made mandatory (Section 1, Article 105).

This is not a case where a mandatory provision was ignored. The individuals whose signatures were rejected did attempt to comply with Section 3, and they did so in the manner that the petition and samples given suggested to follow, i. e., by placing their city and state in the column titled "P.O.ADDRESS CITY—STATE" (Sample —"Bowman, N.D."), and by indicating township or county under the column titled "RESIDENCE," also as suggested by the sample.

It is not alleged that the rejected signatures are not genuine. Rather, they were rejected because the secretary of state, after approving the form of the petition, construed the words "P.O. ADDRESS" to require house numbers and street addresses in addition to city and state in the cases of the larger cities in this state.

■ It is, of course, absolutely necessary that each individual who signs a petition be an "elector," i. e., one who is qualified to vote on the law. This requirement has always been a part of the constitutional provision dealing with the initiative and referendum. *Hernett v. Meier, supra.*

The further requirements that each elector shall also write in the date of signing and his post-office address were added to the Constitution with the adoption of Article 105. They had previously been the subject of a statute, § 16–01–11, NDCC.

■ The purpose for adopting § 16–01–11, requiring a post-office address, was not to make the signature more valid, but to aid the secretary of state in contacting the signer to determine whether he or she was a qualified elector and did, in fact, sign the petition. *Schumacher v. Byrne,* 61 N.D. 220, 237 N.W. 741 (1931). In a 1970 case, *Hernett v. Meier, supra,* a dissent was written suggesting these provisions were not enough, and that reform was necessary to discourage fraud in the referral process. The 1971 Legislature apparently had this same thought in mind, as § 16–01–11 was amended and two new provisions, § 16–01–

11.1 and § 16–01–11.2 were created (S.L. 1971, Ch. 215). Section 16–01–11.1, in addition to providing the secretary of state with a method by which he could pass on the sufficiency of petitions, stated that if, in the course of determining the sufficiency of a petition, he should discover fraud, "he shall deliver the evidence thereof to the attorney general who shall prosecute the perpetrators."

Adding the requirements of the date of signing and post-office address to the Constitution apparently then were not immediately in response to *Hernett.* Presumably they place a greater burden on the committee for petitioners and secretary of state, who act as agents for the people, to preserve the integrity of the process. However, this burden should not work to the disadvantage of the qualified electors who signed the petition and expected their signatures to be counted.

In the instant case, 13,270 people signed the petitions, evidencing a desire to have the bill referred. They attempted to comply with the constitutional provisions by adding their city and state to the designated column, in accordance with the sample provided.

■ The Constitution does not define what constitutes "post-office address." It would not promote the purpose of the Constitution to exclude a signature because the signer failed to comply strictly with a technical requirement where the sample provided misled the signer to believe that city and state (i. e., "Bowman, N.D.") was a sufficient designation of post-office address. We do not mean to imply that the secretary of state may never require a street address. Rather, under the circumstances of this case, substantial compliance with the constitutional mandate is sufficient. See *State v. Gray,* 67 N.D. 148, 271 N.W. 133 (1937); *Anderson v. Byrne,* 62 N.D. 218, 242 N.W. 687 (1932). Cf., *State v. Hall,* 35 N.D. 34, 159 N.W. 281 (1916); *State v. Hanna,* 31 N.D. 570, 154 N.W. 704 (1915).

Although it undoubtedly would have been easier had complete addresses been given, Meier was able to contact the people whose

signatures he rejected. In paragraph 21 of his affidavit to this court he states: "On or about August 8, 1979, I personally began contacting individuals whose names appeared on the petitions with, in my opinion, insufficient addresses, to determine whether they had been contacted to insert their full post office address on the petitions." The problem could easily be rectified in the future by making sure that signers are instructed to give their house numbers and street addresses, if any, in addition to the city and state.

We are guided in our decision by the principle that the right of the people to be heard should be maintained. We will not defeat the real intent of the signers on the basis of a petition that was not artfully drawn and was misleading. We hold, under the circumstances of this case, that the designation of city and state was a sufficient compliance with Section 3 of Article 105. We reverse the decision of the secretary of state and remand for placing the question on the ballot.

In light of what we have said, we need not address the question of whether or not the corrections made by the committee for petitioners were proper. Likewise, we deem it inappropriate for this court to address the other purported irregularities raised by the attorney general. It has not been asserted that those irregularities entered into the secretary of state's determination that the petitions were insufficient. It appears further that proceedings under the statute are available in the case of fraud.

A public question being involved, there will be no costs allowed.

PAULSON and SAND, JJ., concur.

VANDE WALLE, Justice, concurring specially.

I concur in the disposition of this matter by the majority opinion. The requirement of adding an address to the signature can have but limited purpose—to assist the Secretary of State in ascertaining whether or not that person actually signed the petition and whether or not the signer is an elector of the State of North Dakota. There is no doubt in my mind that if the population of the cities in North Dakota continues to increase and the population of the rural areas continues to decrease, the need for street addresses in the cities to assist the Secretary of State in his task will become more significant. It is no mystery that it is easier to determine the residence of a person in rural North Dakota—where most people know one another—than it is in the more densely populated cities where it is not uncommon to find several persons with the same forename and surname in the telephone or city directory. I find nothing reprehensible in requiring street addresses in the larger cities but not requiring them in the smaller cities in which street addresses are not commonly used or may not even exist. Requiring the signer of the petition to add his own street address thereto may help to ensure the correctness of the address; however, because the purpose of the requirement of a street address is only to assist the Secretary of State in determining whether or not the signer actually signed the petition and whether or not the signer is an elector of the State, I do not believe the signature should be rejected if, as in this case, the street address was added during the period of correction by some person other than the signer of the petition. If the party adding the street address places the wrong address on the petition and if the Secretary of State cannot locate the signer of the petition, it may be cause for rejecting that signature, but I do not believe the fact that the street address is added by someone other than the signer is a valid reason of itself for rejecting the signature. I would therefore hold the requirement that the signer write in his street address to be directory rather than mandatory, and would not reject the signature because some other person added the street address.

In his response to the Petition for Review, the Secretary of State raised several additional issues regarding the circulation of the petitions—which he now contends may make the petitions invalid. These include such matters as the petitions not be-

788

ing circulated by named "circulators"; the signature of the circulator of the petition being notarized prior to circulation; persons signing petitions outside the presence of any circulator at all; and altered dates of acknowledgments by circulators. Section 3 of Section 1 of Article 105 of the Amendments to the North Dakota Constitution requires:

> "The petition shall be circulated only by electors. They shall swear thereon that the electors who have signed the petition did so in their presence. . . ."

The allegations of the Secretary of State, if true, may have considerably more significance than the issue with which we are here concerned. The requirement of having the elector sign the petition in the presence of the circulator and of having the circulator swear that the electors who have signed the petition did so in the presence of the circulator may be significantly more important in preventing fraud than the requirement of street addresses. In addition, the falsification of an acknowledgment either by the person acknowledging his signature or by the notary public taking the acknowledgment is not a matter to be treated lightly. There was no attempt to deny the fact that someone other than the signers of the petition added certain addresses to the petition during the period of correction. Whether the additional allegations of the Secretary of State contained in his return would be denied or admitted by the parties involved is not known to us.

However, in his letter of August 24, 1979, to McCarney, the Secretary of State raised these allegations by stating:

> "*While not being determinative of the insufficiency of the petition, other matters have been brought to my attention by electors through means of affidavit and other information that raise the question of the validity of certain signatures for reasons other than insufficient post office address.* . . ." [Emphasis supplied.]

We do not know whether the allegations are founded in fact or whether, if they were founded in fact, the Secretary of State would have declared the petitions insufficient for those reasons. Because the facts and the Secretary of State's determination based thereon are lacking in the record before us, these allegations are not a proper matter for the present proceeding.

For these reasons, I concur with the majority opinion in the disposition of this matter.

ERICKSTAD, Chief Justice, dissenting.

I respectfully dissent.

Although Justice Pederson, in speaking for the majority of our court correctly states principles of constitutional construction, in his search for the meaning of the present language of the pertinent provisions of our State Constitution he has ignored recent history and thus has arrived at conclusions of law that are strained and that fail to express the actual intent of our people. In view of our decision in *Hernett v. Meier,* 173 N.W.2d 907 (N.D.1970), and the response of the people of our state through their approval of a constitutional amendment (N.D.Const. art. 105, § 1(3) adopted in 1979) requiring that each elector signing a petition to refer a law enacted by the Legislature also write in his post-office address, it is incumbent upon this court to recognize that change in the constitution and act accordingly.

When *Hernett* was decided in 1970, the requirement that each signer of a referral petition also add his residence and post-office address was statutory only. Such a requirement was not a part of our State Constitution, which, subject to the United States Constitution and treaties appropriately entered into, is the highest law in our state. As the majority opinion in *Hernett* said, "All that the Constitution requires is that the person sign his own name and that he be an elector of the State of North Dakota." At that time the Constitution required nothing more. Article II Section 25 of our Constitution, in effect at that time, said that, "Laws may be enacted to facilitate its operation, but no laws shall be enacted to hamper, restrict, or impair the

exercise of the rights herein reserved to the people." On the basis of the foregoing constitutional provisions, the majority in *Hernett* interpreted the statutory requirement for residence and post-office address as being met by those signers listing only their county, city, and state. I dissented in *Hernett,* saying that the unfortunate result of the majority's approach in reviewing referendum petitions was to make discovery of, and prosecution for, fraud almost impossible. I suggested that such an approach might ultimately discredit the referendum process. In that dissent I stressed the need for constitutional and statutory reform to, in essence, build integrity into the system.

Although constitutional change occurs slowly, and rightfully so because hastily conceived and adopted changes could be very disruptive if not disastrous, constitutional reform did come when our people, on November 7, 1978, approved Article 105 as an amendment to the Constitution of North Dakota.[1] Section 3 of Section 1 of Article 105 provides in relevant part:

"Each elector signing a petition shall also write in the date of signing and his post-office address."

In view of the foregoing historical background leading to the approval of Article 105 by our people, one cannot read that provision to mean anything other than what it says, that is, "Each elector shall write in the date of his signing and his post-office address." The Secretary of State, in performing his constitutional duties, determined that an address to comply with this provision would have to be complete enough to permit delivery of mail by the postal service to the signer at the address written by the signer on the petition.[2] That was a reasonable conclusion in light of his responsibilities to pass upon the sufficiency of the petitions (in effect, to verify the authenticity of the signatures).[3]

In his affidavit, dated September 21, 1979, the Secretary of State says in relevant part:

"On August 10, 1979, I caused 250 cards to be mailed to individuals whose post office address was indicated as 'Bismarck', 'Mandan', 'Dickinson' and several other large cities throughout the state; the addresses used on the cards were the addresses given on the petitions when originally filed (Exhibits 8–1 through 8–284). On August 16, 1979, I caused an additional 110 cards to be mailed to individuals in the same cities. 290 of all cards were returned unlivered [undelivered] because of 'insufficient addresses'."

In *Hernett* our court utilized an abuse of discretion standard for reviewing the secretary's determination of the sufficiency of referendum petitions. Justice Strutz, speaking for the majority, said:

"So the Constitution places upon the Secretary of State the duty of determining, in the first place, whether the petitions conform to the requirements of the Constitution and the laws of this State. In the discharge of such responsibility placed upon him, the Secretary of State must exercise a certain amount of discretion. Can we say that he has abused this discretion in passing upon the petitions

---

1. The delegates of the 1972 Constitutional Convention submitted an entirely new state constitution which the voters rejected on April 28, 1972. That proposed constitution included the following provision regarding the referendum process, "Each elector signing a petition shall also write in the date of signing and his post-office address." The 1977 Legislature adopted House Concurrent Resolution Number 3088 (S.L.1977, Ch. 613, § 1) for the creation of a new article (Article 105) to the Constitution of the State of North Dakota. That resolution, which includes the identical provision quoted herein with regard to the referendum process, was approved by the voters on November 7, 1978.

2. In *Dawson v. Meier,* 78 N.W.2d 420, 428 (N.D.1956), this court defined a "post office address" as follows: "The post office address of a person is the place to which his mail is directed in order that it may be delivered to him by the post office. Or, in other words, it is the place where he gets his mail."

3. "The secretary of state shall pass upon each petition, and if he finds it insufficient, he shall notify the 'Committee for the Petitioners' and allow twenty days for correction or amendment. . . ." (N.D.Const. art. 105, § 1(6)).

here under consideration? We do not believe that an abuse of discretion has been shown." 173 N.W.2d at 918.

If the Secretary of State is authorized by our State Constitution to exercise discretion, we must recognize that the discretion is his, not ours. In my view he did not abuse his discretion in determining that the addresses placed on the petitions were insufficient when mail addressed to those addresses was returned as undeliverable. His decision should be upheld especially in light of the way that he illuminated the path by which the petitioner could proceed to comply with the State Constitution.

The Secretary of State, by letter dated July 24, 1979, informed the petitioner, Robert P. McCarney, of the exact manner in which the petitions could be made to comply with the State Constitution:

"It is necessary that you return each numbered petition requiring correction to the same circulator who signed the affidavit and who circulated such petition. The circulator must contact each signer whose address needs to be completed and have such signer write his or her complete address, as is now required by the Constitution.

"Each petition returned with corrections or amendments should be accompanied by an affidavit of the circulator stating that he (or she) previously circulated the petition, that he (or she) personally contacted the signers who needed to complete their addresses, that he (or she) witnessed each signer write his (or her) complete Post Office address, and that he (or she) knows that the persons who signed the petition initially are the same persons who wrote in their own Post Office addresses."

Notwithstanding those specific and clear instructions, the petitioner did not follow them. Instead, he had persons who were apparently not even circulators insert house numbers and street addresses in the petitions, by the use of telephone directories, for signers who had originally failed to do so. In *Hernett,* it was urged that a number of signatures were invalid because the petition circulator inserted the residence and post-office addresses of the signers out of the immediate presence of the signers. In upholding that practice, Justice Strutz, speaking for the majority of the court, said:

"As we heretofore have pointed out, all that the Constitution requires is that the person sign his own name and that he be an elector of the State of North Dakota. These signatures clearly comply with this fundamental constitutional requirement. Nowhere in the Constitution is there a requirement that the signer of the petition place his residence, postoffice address, and date of signing on the petition in his own handwriting."

In response to that statement, the Legislature passed a concurrent resolution providing for a constitutional amendment and our people approved it.[4] That amendment, which is contained in Article 105 of our State Constitution, now specifically requires that each elector sign his name and also write in his post-office address on any referral petition. It cannot now be an abuse of discretion for the Secretary of State to insist that the post-office address be written on the petitions by the electors signing the petitions in compliance with Article 105.

Justice Pederson has ignored the historical background leading to the adoption of Article 105 and in so doing he has arrived at a conclusion that ignores the intent of both the Legislature and the people to provide a referral process that discourages fraud. His refusal to interpret the constitutional requirement of a post-office address as necessitating a street or number is based primarily on the view that the sample petition may have misled the signers. It should be noted that most of the signers having a street or number did include these items as part of their post-office address on the petitions. It is unfortunate if some of the signers were misled by the sample, but such a possible circumstance cannot justify reading an exception into the Constitution where none exists. If it could justify such an exception, the vitality of numerous con-

4. Our people approved the amendment by a vote of 102,182 to 75,413. Ch. 696, 1979 S.L.

stitutional mandates would be entirely dependent upon the acts of governmental officers and employees. Such an approach is a frail basis upon which to construe constitutional provisions.

Justice Pederson says that the post-office address requirement "should not work to the disadvantage of the qualified electors who signed the petitions and expected their signatures to be counted." This cannot be a sufficient reason to allow noncompliance with a constitutional mandate.

In the case of *Kuhn v. Beede,* 249 N.W.2d 230 (N.D.1976), this court held, in an opinion written by Justice Paulson, that an absent voter's ballot could not be counted in those instances where the election officials failed to stamp and initial the ballot as an official ballot pursuant to the statutory requirement. It was therein urged that the absent voters should not be denied their privilege to vote through the default or neglect of an election officer to properly endorse the ballots. The majority of this court rejected that argument and quoted approvingly from the case of *Miller v. Schallern,* 8 N.D. 395, 79 N.W. 865, 866–67 (1899),

> " ' . . . counsel's utmost contention is that an enforcement of the statute as it reads may in some cases operate, and in the case at bar will operate, practically to deprive electors of their constitutional right to vote, and to have their votes counted. But this cannot be made a test of the validity of any regulative statute. There are many regulative provisions in election statutes the enforcement of which will and do operate to deprive voters of their privilege, and yet their constitutionality cannot be successfully challenged. . . . ' " 249 N.W.2d at 237–38.

In holding that the absent voters' ballots in *Kuhn* could not be counted, we said:

> "The contention is made that, because fraud has not been alleged in the casting of the 202 absent voters' ballots which were not endorsed with the official stamp and initials, they should be counted notwithstanding that the law specifically provides that such ballots are void. If we were to hold that unless fraud is alleged such ballots shall be counted, we would be encouraging such allegations in the future. An allegation of fraud is easily made but is difficult to prove. . . . It is no doubt because of this difficulty and the consequences in the election process of such a requirement that the legislature required the stamping and initialling of ballots in order to prevent fraud in the first instance. Although we can conceive of means by which such a procedural safeguard might be circumvented, and although there may be other means that could be devised to prevent fraud, we cannot conclude that the means adopted by our legislature does 'not contribute substantially to the integrity of the election process'." 249 N.W.2d at 236.

The foregoing reasoning in *Kuhn* is even more compelling in the instant case because we are dealing here with a constitutional mandate, not merely a legislative one. We cannot validly interpret out of existence the constitutional requirement of a post-office address on the ground that the signatures of some qualified electors may not be counted if the requirement is upheld.

Through the appellate brief prepared by counsel for the Secretary of State and by the personal affidavit of the Secretary, this court has been informed of certain irregularities in the referral petition process which were discovered by the Secretary of State during his investigation into the sufficiency of the petitions. The validity of 1,842 signatures may be affected by one or more of the following irregularities: (1) Persons signing petitions as circulator did not personally circulate the petitions; (2) Dates of notarization on petitions were changed subsequent to the notarization; and (3) Petitions were notarized prior to acquisition of any signatures on the petitions.

Section 3 of Section 1 of Article 105 of our Constitution, reads:

> "The petition shall be circulated only by electors. They shall swear thereon that the electors who have signed the petition did so in their presence."

A circulator who does not personally circulate a petition cannot swear thereon that the electors who have signed the petition did so in their presence. If the circulator does so swear, he has sworn falsely. An appropriate deterrent of such perjury would be rejection of the petition.

As the Secretary of State did not include these irregularities in his notice informing the petitioner of matters requiring correction, they may not be a basis for the Secretary's rejection of signatures. Notwithstanding that fact, if the foregoing irregularities are true they further demonstrate the type of loose procedure that our State Constitution as now written was designed to prevent.

By the approval of Article 105, our people have responded to the need for constitutional reform to strengthen the referendum process against the potential for fraud. For the reasons stated herein, I would uphold the Secretary of State's refusal to place the referred statute on the ballot.