Brynhild HAUGLAND, Chester Reiten and Rolland Redlin, Petitioners,

v.

Ben MEIER, Secretary of State, State of North Dakota, Respondent.

Civ. No. 10497.

Supreme Court of North Dakota.

Oct. 17, 1983.

See also, 335 N.W.2d 809.

27–17–03, N.D.C.C.

McGee, Hankla, Backes & Wheeler, Minot, for petitioners; argued by Orlin W. Backes, Minot.

Robert O. Wefald, Atty. Gen., and Terry L. Adkins, Asst. Atty. Gen., Bismarck, for respondent; argued by Attorney General Wefald.

Rosenberg, Evans, Moench & Baird, Bismarck, for sponsors; argued by Dale W. Moench, Bismarck.

SAND, Justice.

This is an original proceeding. The petitioners, for the second time, pursuant to Article III, § 7, of the North Dakota Constitution, requested this Court to review and reverse the Secretary of State's approval of the petition as to form to refer House Bill 1500, enacted by the 1983 Legislative Assembly, changing the name of Minot State College to Dakota Northwestern University.

The respondent Secretary of State, and the sponsors of the referral petition, filed returns to the request and presented arguments.

The sponsors, before circulating the petition, and pursuant to Art. III, § 2, of the North Dakota Constitution, presented to and obtained the Secretary of State's approval as to form.[1]

On the first challenge we reversed and set aside the decision of the Secretary of State and enjoined him from placing House Bill 1500 on the ballot because the petition contained an impermissible extraneous statement of intent. *Haugland v. Meier*, 335 N.W.2d 809 (N.D.1983). We reached a similar conclusion in *Lips v. Meier*, 336 N.W.2d 346 (N.D.1983). In this proceeding the petitioners contended that the Secretary of State should not have approved the petition because it contained an impermissible introductory statement designating the next general election for approval or rejection of the Bill in violation of Art. III, § 2 and § 5, of the North Dakota Constitution, and that the Bill was not subject to suspension under present circumstances. The statement in question is:

"TO THE SECRETARY OF STATE, STATE OF NORTH DAKOTA:

We, the undersigned, being qualified electors of the State of North Dakota, consisting of more than two percent of the resident population of the state as of the last federal decennial census, by this petition request that House Bill No. 1500 and the whole thereof passed at the Forty-eighth Legislative Assembly of North Dakota be placed upon the ballot and that it be submitted by the Secretary of State for either approval or rejection by the electors of the State of North Dakota at the next general election."

The statement in the first *Haugland* case was almost identical to this one except it had "primary election" instead of "general election." It also had the additional following language:

"This election is to be held on or about June 12, 1984.

"We do this in accordance with the provisions of Article III of the North Dakota Constitution."

---

1. House Bill 1500 was filed with the Secretary of State on 19 April 1983. The sponsors circulated the petitions and submitted them to the Secretary of State on or before 18 July 1983, containing ostensibly the required number of signatures specified in Art. III, § 4. The Secretary of State filed an affidavit with this Court stating he has approved the petition as containing the valid number of signatures and has designated that House Bill 1500 be placed on the ballot at the primary election in 1984, the next statewide election.

This statement, however, was not challenged in the first *Haugland* case.

This poses an interesting[2] question: Why the change?

The pertinent parts of the constitutional provisions relating to the questions raised are as follows:

"... the people reserve the power ... to approve or reject legislative Acts, or parts thereof, by the referendum .... This article is self-executing and all of its provisions are mandatory. Laws may be enacted to facilitate and safeguard, but not to hamper, restrict, or impair these powers." Art. III, § 1, N.D.Const.

"A petition to initiate or to refer a measure shall be presented to the secretary of state for approval as to form. A request for approval shall be presented over the names and signatures of twenty-five or more electors as sponsors, one of whom shall be designated as chairman of the sponsoring committee. The secretary of state shall approve the petition for circulation if it is in proper form and contains the names and addresses of the sponsors and the full text of the measure." Art. III, § 2, N.D.Const.

"... A referendum petition may be submitted only within ninety days after the filing of the measure with the secretary of state. The submission of a petition shall suspend the operation of any measure enacted by the legislative assembly except emergency measures and appropriation measures for the support and maintenance of state departments and institutions.... A referred measure may be voted upon at a statewide election or at a special election called by the governor." Art. III, § 5, N.D.Const.

"The secretary of state shall pass upon each petition, and if he finds it insufficient, he shall notify the 'committee for the petitioners' and allow twenty days for correction or amendment. All decisions of the secretary of state in regard to any

such petition shall be subject to review by the supreme court...." Art. III, § 6, N.D.Const.

"All decisions of the secretary of state in the petition process are subject to review by the supreme court in the exercise of original jurisdiction...." Art. III, § 7, N.D.Const.

"If a majority of votes cast upon an initiated or a referred measure are affirmative, it shall be deemed enacted. An initiated or referred measure which is approved shall become law thirty days after the election, and a referred measure which is rejected shall be void immediately...." Art. III, § 8, N.D.Const.

In *Haugland* number 1, *supra* at 811, we specifically noted that "Unlike in *McCarney* [*McCarney v. Meier*, 286 N.W.2d 780 (N.D. 1979)], we have in this case a challenge of the approval of the form of the petition at a time when a determination of insufficiency still affords time for correction or amendment." Even though we are again reviewing the Secretary of State's approval of the petition as to form, in this instance the deadline for submitting petitions to the Secretary of State has gone by, thus no time is available within which corrections or amendments can be made as to the form of the petitions. However, in *Lips, supra,* we also had under consideration the approval as to form of a referral petition by the Secretary of State when, for all practical purposes, the sponsors had very little time to make the corrections and secure signatures again. In *Lips* we emphasized the difference between procedural and substantive material. [See *State ex rel. Turner v. Limbrecht*, 246 N.W.2d 330 (Iowa 1976)].

We also note that in the instant case the sponsors do not have the twenty days allowed under Art. III, § 2, for correction or amendment. This emphasizes the importance of the actions of the Secretary of

2. As a point of interest, the petition in *Lips, supra,* decided after the first *Haugland* case was decided but before the instant case, contained the identical language presently under consideration in *Haugland* number 2, except for

the identification of the Bill. In *Lips* this statement was not challenged or discussed by any party, and consequently was not discussed by this Court.

State in approving or disapproving a petition as to form.

The people of this State, in adopting Art. III, § 2, imposed the additional duty and responsibility of examining and approving the petition prior to circulation upon the Secretary of State to assure that the petition, as to form, is correct and thus avoid a subsequent challenge as to form. It was also designed to give advance publicity of any referral effort. *See* Minutes of the Constitutional Convention. The duty of the Secretary of State under § 2 is different and should not be confused with the responsibility under § 6 pertaining to the sufficiency of the petition after the signatures have been obtained and the petitions are submitted to the Secretary of State. The sponsors, in presenting a petition for approval as to form, are not allowed twenty days in which to make corrections or amendments as allowed in § 6. The sponsors must act within the ninety-day deadline.

■ The responsibility under § 2 requires more than a perfunctory approval which may actually defeat the purpose and intent of § 2. The referral process has basically one objective, that is to cause the measure or bill to be placed on the ballot for a vote of the people. To use it for any other purpose or objective, including campaigning for or against the item referred, is improper and may eventually hinder or destroy the process. An elector signing the petition is not obligated morally or legally to vote "no" on the referral item. Such elector may vote in favor of or against the item after it is on the ballot.

■ The Secretary of State, under § 2, is expected and required to exercise prudent judgment in approving a petition as to form to preserve the purpose and objective of the referral process. Merely because a petition contains the names and addresses of the sponsors and the full text of the measure does not entitle it to be approved if it also contains other impermissible statements. Whenever a petition is submitted for approval as to form, the Secretary of State is expected to recognize nonessential, questionable, confusing, misleading, inaccurate items or statements that serve no legitimate useful purpose, including statements against the measure, and require them to be eliminated. If appropriate action by the Secretary of State is taken at this stage (presentation of petitions as to form under § 2) and the ninety days have not expired, any correction, amendment, or elimination may easily be accomplished with very little effort or cost and probably will avoid subsequent problems, and save expenditure of time and money, as well as eliminate some emotional frustrations. Inattention to the constitutional duties or the failure to perform them properly plays favorably into the hands of those opposed to the referral process and may ultimately cause its demise.

The respondent and sponsors argued that the statement was only a request. The term "request" is used in the statement. However, that in itself is not dispositive of the issue. The sponsors and signers may have been led to believe, and were under the erroneous impression, that the request was mere pro forma and that the Secretary of State, the respondent, was required to grant the request as a matter of law. We do not know how this statement may have influenced any signers. Nor was any explanation given.

The delegates at the Convention opted for the statewide election rather than the general election after Delegate Hill stated, "I have never been concerned about the size of the vote, only the quality of it." Be that as it may, the error has been practically remedied by the Secretary of State by designating the next statewide election for the referral of House Bill 1500.

The challenged statement designating or requesting the general election as the time for the referral might have been proper under the prior constitutional provision [3]

---

3. Possibly the sponsors and the Secretary of State had in mind the old constitutional provision rather than the new one or they may have had in mind Committee proposal No. 1–109 which would have designated the general election for a referral vote but was not adopted.

§ 25, Art. II, now repealed, which in part provided:

"Each measure . . . referred to the electors . . . shall be voted upon at any statewide election designated in the petition, or at a special election called by the governor. . . ."

The new constitution § 5 does not mention general election on this matter but merely provides:

"A referred measure may be voted upon at a statewide election or at a special election called by the governor." Art. III, § 5, N.D.Const.

However, regarding the initiative, the constitution provides:

"An initiative petition shall be submitted not less than ninety days before the statewide election at which the measure is to be voted upon. . . ." Art. III, § 5, N.D.Const.

The sponsors also argued that the constitution does not specifically provide that the referral petition be placed on the ballot at the *next statewide election.*

 The term "statewide election" is not defined nor has it become a word of art. The term is used in North Dakota Century Code § 16.1–13–08 setting forth the procedure to fill a vacancy in the United States Senate. See also *State ex rel. Lanier v. Hall,* 74 N.D. 426, 23 N.W.2d 44 (1946), regarding statewide election for a Senate vacancy under then § 16–0707, NDRC 1943. See also *Hernett v. Meier,* 173 N.W.2d 907 (N.D.1970), which contains the language "next primary or special statewide election, whichever occurs first." See also NDCC § 16.1–16–01(7) referring to congressional, statewide, district, recounts, etc. (and § 16–15–01.1 now repealed). Basically, we have three types of elections: primary, general, and special. All three may be statewide elections if all of the electors are entitled to vote in the election. A primary election is merely a nominating process and is technically not considered an election [*Leu v. Montgomery,* 31 N.D. 1, 148 N.W. 662 (1914) ]; but, because the election process is used and all of the electors of the state may participate in the nominating election procedure, it is a statewide election.

 We recognize that the constitution does not specifically require that the referred measure be placed on the ballot at the next statewide election. However, § 5, Art. III not only provides that the referred measure be voted upon at a statewide election, but also provides for a special election which may be called by the governor. This indicates that the people sensed an urgency to get the matter voted upon and resolved. Furthermore, if the proposition that the referral measure need not be placed on the ballot at the next statewide election were applied, as contended and argued by the sponsors, the results would be disastrous. If it is not at the next statewide election, when should it be placed on the ballot, in two, four, or ten years? If the constitutional provision were not construed to mean the next statewide election, the Secretary of State, if so inclined, could actually delay placing the matter on the ballot until the people would no longer be concerned with the issue or even indefinitely. This would bring about an absurd result which we should not do. 16 Am.Jur.2d *Constitutional Law* § 112, p. 464. After considering the objectives of the constitutional provision, we conclude that the constitution implicitly requires that the referred measure be placed on the ballot at the next statewide election so that the subject matter can be resolved promptly. A deliberate delay could effectively destroy the referral process.

The challenged statement also contains the following inaccuracy:

"We, the undersigned . . . consisting of more than two percent of the resident population of the state as of the last federal decennial census . . . ."

Each petition contained less than fifty signatures according to statements by counsel made at oral argument, which is considerably less than two percent of the population. A complete petition was not included in the pleadings. Conceivably, the statement may have meant that collectively, when all the petitions are filed, the signa-

tures would be two percent or more. Nevertheless, the statement on each petition is inaccurate.[4]

Any argument that the petition tracked language of petitions that are on file with the Secretary of State's office is of no consolation or support because § 2, or a similar provision, was not contained in the constitution prior to 1978. Furthermore, the petitions that were on file with the Secretary of State prior to that time were not challenged as to form but were primarily challenged on the merits as to sufficiency of valid signatures after the petitions were filed for final approval, etc. Consequently, case law prior to the adoption of § 2 is not applicable and does not constitute precedent for the interpretation and construction of Art. III, § 2.

The Secretary of State, in his affidavit, stated that the referral petitions were filed [5] with his office; that he passed on the petitions, found them to be sufficient and intended to place House Bill 1500 on the ballot at the primary election in June 1984. This is inconsistent with his approval as to form. However, he explains this by stating that he treated the statement on the peti-

tion as a mere request. On legal questions the Secretary of State has available the state's legal advisor, the Attorney General.

The petitioners' affidavit stated the Attorney General had "suggested" to the Secretary of State that the statement not be included in the petition, but the Secretary of State did not follow the suggestion.[6]

■ Even though the statement or request under consideration may not constitute an impermissible extraneous statement of intent as found in *Haugland* and *Lips,* it nevertheless serves no useful purpose, is inaccurate and misleading, particularly with reference to the election when the referred matter is to be placed on the ballot and the number of signatures purportedly contained in each petition. The statement should have been eliminated. If it had been eliminated the present proceedings in all probability would not have materialized. Section 2 of Art. III was designed so that the Secretary of State, before approving the petition as to form, would require elimination of all unnecessary material so that if the petition is circulated, submitted, and ultimately challenged then only matters of real substance would be considered, rather

---

**4.** Two percent of the population of 652,695 equals 13,054. The statement would have been more accurate if it had not stated any figure but only stated "We, the undersigned, being qualified electors, request House Bill 1500 passed by the Forty-Eighth Legislative Assembly to be placed upon the ballot as provided by law." It is up to the Secretary of State to determine the number of valid signatures and, if sufficient, to place the measure on the ballot as provided by law. The constitutional provisions suggest that the sponsors, in submitting the petitions to the Secretary of State, rather than the signers, should make the formal request to him that the matter be placed on the ballot as provided by law. The heading on petition already states its objective, which is to have the matter referred to a vote of the people. The petitioners primarily directed their challenge to the statement containing the reference that the vote would be at the next general election. From this we may surmise that the petitioners, except for the reference to the general election, are not concerned with other portions of the statement.

The referral petition, as to form and objective, except for number of sponsors and signatures, is comparable to a petition to have a

name of a candidate placed on the primary election no-party ballot.

**5.** The minutes of the Constitutional Convention reflect the word "file" was changed to "submit" at the suggestions and request of the Secretary of State, but his affidavit uses the word "file."

**6.** The Attorney General admitted that he advised the Secretary of State not to approve the petition because of the statement. However, the Attorney General observed in his argument to this Court that the Secretary of State is a constitutional elected officer and is bound by his advice. Resort to Art. III, § 5, would have answered the question as to which election applied. In *State v. Baker,* 74 N.D. 244, 21 N.W.2d 355, 363 (1945), the North Dakota Supreme Court observed the Attorney General is also a constitutional officer whose duties are prescribed by statute, which includes giving opinions to state officers, and then said:

"If they follow this course they will perform their duty, and even though the opinion thus given them be later held to be erroneous, they will be protected by it. If they do not follow this course, they will be derelict to their duty and act at their peril."

than items relating to form. Section 2 can function properly only if the Secretary of State reviews the petition in a prudent manner rather than approving the petition as presented on a perfunctory basis. While we have no hesitation to state that the statement should have been eliminated, but because of countervailing circumstances producing a form of excusable neglect, we are not convinced and do not conclude that the approval of the Secretary of State must be reversed and set aside. If time for correction were available other equitable principles might be applicable.

The countervailing circumstances include apparent good faith action by the sponsors even though they may have been the result of erroneous impressions from previous petitions on file with the Secretary of State and from erroneous reliance upon prior case law which has no application to the pertinent present constitutional provisions under consideration now. The impression may have led the sponsors and the Secretary of State to believe that the petition could designate at which election the referral would be voted upon. On this matter the Secretary of State in an affidavit to this Court stated that the referral will be on the ballot at the next statewide election, the primary election, rather than at the general election. Also, the petition containing the unchallenged identical language, except for the bill number, in a contemporary petition, *Lips, supra,* was successfully challenged but only on another item regarding a statement of intent. This may have left an erroneous impression. In addition, the lack of time in which to make corrections or amendments is also a factor even though this, in itself, would not be controlling.

Any one of the foregoing items separately would not be sufficient, but a combination of all of these factors and related matters present a close, complex question and constitute a form of excusable neglect which deserves, and accordingly we apply, principles of equity rather than a strict technical principle of law. However, we hasten to add, because many uncertainties have now been resolved by *Haugland* number one, *Lips, supra,* and this case, any repetition of similar errors in the future will not qualify as a form of excusable neglect deserving disposition upon principles of equity and will be disapproved.

The petitioners contended that House Bill 1500, pursuant to Art. IV, § 41, of the North Dakota Constitution, became effective on 1 July 1983, but the referral petitions were not submitted to the Secretary of State until 5 July 1983, which was after House Bill 1500 had become effective and as a result, House Bill 1500 may not be suspended even though the petitions were submitted within the 90 days.

Regarding the 90 days after the Bill has been filed with the Secretary of State within which the referral petition must be submitted to the Secretary of State, we take into account the sequence in which certain constitutional provisions were adopted. The legislative session was increased from 60 to 80 days by the adoption of Art. IV, § 23, on 7 September 1976 (S.L.1975, ch. 611, § 2; S.L.1977, ch. 596); whereas the 90-day provision within which the petition must be filed with the Secretary of State was approved or adopted on 7 November 1978 (S.L.1977, ch. 613, § 1; S.L.1979, ch. 696). From this we are compelled to conclude that the people were fully aware of the possibilities, just as the delegates were, that a measure including a tax bill could become operative on July 1 and be suspended later if a valid petition is filed with the Secretary of State within the 90 days from the date that the measure was filed with the Secretary of State. The delegates to the constitutional convention of 1972 were made aware that the 90-day period could create some problems but no change was made. We also take into account that the provisions as adopted by the constitutional convention were first rejected and later adopted by the people, but these provisions under consideration here in Art. III and Art. IV were not changed in substance but were submitted to the people again at a later date and were approved. Therefore, the minutes of the 1972 Constitutional Con-

vention are entitled to considerable weight as to objective and purpose.

The petitioners relied heavily upon *State ex rel. Moore v. Toberman*, 363 Mo. 245, 250 S.W.2d 701 (1952), in support of their argument that a law, having become effective, may not be suspended. A review of this case discloses that the principal question was whether or not the referral petition was filed within the required ninety days. The court concluded that the ninety days began to run under the Missouri constitution from and after the beginning of the recess of the legislature, if a recess is taken, rather than from the date of adjournment. The measure in question was passed prior to recess. The petitions were not filed within the ninety days after the recess and, therefore, the measure was not suspended.

 In resolving the issues presented, we must recognize and give full consideration to the constitutional provision which states that Art. III is self-executing and all of its provisions are mandatory. In doing so, we conclude that the 90-day provision within which the petitions must be filed with the Secretary of State, and the provision stating that the submission of a valid petition shall suspend the operation of any measure enacted by the Legislature, except emergency measures and certain appropriation measures, are self-executing and mandatory. This leaves little or no room for construction and means that whenever an adequate petition is submitted within the 90 days to the Secretary of State, on a measure which is not an emergency or an appropriation for a state department or institution, it is suspended in accordance with the constitutional provision which states:

> "The submission of a petition shall suspend the operation of any measure enacted by the legislative assembly except emergency measures and appropriation measures for the support and maintenance of state departments and institutions." Art. III, § 5, N.D.Const.

House Bill 1500 is not an emergency measure, nor is it an appropriation measure.

The petitioners' argument that the measure had gone into effect and consequently could not be suspended is not in conformity with the aforementioned constitutional provision. The only exception to the suspension is if the measure is an emergency measure or an appropriation for certain purposes. Also, considering that § 5 is a part of Art. III, and § 1 of Art. III provides that all of the provisions of Art. III are self-executing and mandatory, leave little doubt that this applies to § 5. If we were to construe the constitutional language that it applies only to measures which have not gone into effect, we would be disregarding the self-executing and mandatory provisions of Art. III.

In reaching our conclusion we are aware that the present challenge is only as to form. The sufficiency and validity of the signatures or other substantive matters are not included in our conclusion. Nor are we indicating that a further challenge as to substance and sufficiency of the signatures may not be appropriate. Neither are we suggesting that such a challenge should be undertaken. If such a challenge is made it will have to be resolved on its merits.

For the reasons stated in this opinion we decline to reverse and set aside the Secretary of State's approval of the petition as to form.

VANDE WALLE, J., and PAULSON,* Surrogate Justice, concur.

ERICKSTAD, Chief Justice, concurring specially.

I respectfully concur in much of what Justice Sand has said in his opinion and in the result he reaches. I, however, would have emphasized the insignificance of the extraneous matter included in these petitions. I conclude that under the circumstances no prejudice could have resulted from the extraneous material and thus the

* Justice WM. L. PAULSON served as a Surrogate Justice for this case pursuant to Section

27–17–03, N.D.C.C.

inclusion of it does not justify a voiding of the referendum process thus far.

PEDERSON, Justice, dissenting.

Although I agree with most of what Justice Sand has written for the majority of this court, I believe that the doctrine of excusable neglect should not be applied and accordingly I disagree with the results reached. Not only do I believe that excusable neglect has no place in cases involving constitutional law, in this case the conduct more clearly fits the definition of defiance rather than innocence.

The first *Haugland* opinion clearly left a "bright line" standard for review of the form of petitions—*approve no extraneous matters*. It ought to be obvious that communications between the committee and the secretary of state are extraneous to the subject matter of a referral petition. The Attorney General advised the secretary of state appropriately. There is no excusable neglect involved. Justification for "Sunburst" type treatment is absent. Injustice is not avoided by the prospective application. See *Kitto v. Minot Park District*, 224 N.W.2d 795, 804 (N.D.1974).

If there is to be a court test of the form of the petition, let it be between the committee and the secretary of state. That can ordinarily occur only if the secretary rejects *all* extraneous material.